CAMPBELL COUNTY STATE BANK, INCORPORATED, OF HERREID, SOUTH DAKOTA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80064, 80065. Filed December 11, 1961.

*Orville W. Robbins, Esq.,* for the petitioner.
*William Theodoros, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income taxes of petitioner as follows:

| Docket No. | Year | Deficiencies |
|---|---|---|
| 80065 | 1954 | $4,391.99 |
| | 1955 | 6,480.16 |
| | 1956 | 5,562.62 |
| 80064 | 1957 | 5,533.50 |

The issues are:

(1) Whether respondent correctly determined that the income of the Herreid Insurance Agency is taxable to the Campbell County State Bank, Inc.; and

(2) If not, whether respondent correctly determined that certain amounts deducted by the Campbell County State Bank, Inc., are properly deductions of the Herreid Insurance Agency and, if so, what those amounts should be.

FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioner Campbell County State Bank, Inc., of Herreid, South Dakota (hereinafter sometimes referred to as Bank), was organized and chartered under the laws of the State of South Dakota on March 19, 1944.[1] Its principal place of business is in Herreid, South Dakota.

Corporate income tax returns of petitioner were filed with the district director of internal revenue for the district of South Dakota for the taxable years 1954 through 1957.

Early in 1944, several of the organizers of Bank approached William Block (hereinafter sometimes referred to as Block) to ask him to buy stock in Bank and be its cashier. They also stated they were organizing a partnership to engage in the insurance business and asked Block if he would manage that business. Block said he would.

At that time Block, in partnership with a man named Herboldt, was operating his own insurance agency at Herreid in the name of Herreid Insurance Agency. Block was also manager of the Herreid branch of the Eureka State Bank. When the incorporators of Bank received their charter to operate in Herreid, the Eureka State Bank was obliged to discontinue the operation of its Herreid branch.[2]

In the spring of 1944 several of the incorporators of Bank requested legal advice from Paul O. Kretschmar (hereinafter sometimes referred to as Kretschmar), a South Dakota attorney, regarding the insurance business. Kretschmar, who had represented the Eureka State Bank, advised them that South Dakota law forbade banks from engaging in the insurance business. He suggested that, if they wished

---

[1] So stipulated. The articles of incorporation indicate that they were approved by the State Banking Commission on March 6, 1944, and filed by the secretary of state on March 9, 1944.

[2] S. Dak. Code, sec. 6.0402 (1939), amended as to a matter not here relevant by ch. 11, L. 1957 (S. Dak. Code, sec. 6.0402 (supp. 1960)).

6.0402 Branch offices and branch banks authorized. A branch office or a branch bank may be conducted by a bank only with the permission of the Commission under such rules and regulations as the Commission shall prescribe, and such permission to be in the sole discretion of the Commission. No branch office shall be operated in any city or town after any state or national bank has received authority to operate in such town or city. Only one branch office shall be established in any town or city.

to engage in the insurance business, they should create a separate partnership or corporation for that purpose.

Articles of copartnership were drawn up by Block and executed by the 25 incorporators of Bank on June 13, 1944, creating the Herreid Insurance Agency (hereinafter sometimes referred to as Insurance). The articles provided as follows:

ARTICLES OF AGREEMENT, made and concluded this 13th day of June in the year 1944 between the undersigned partners.

The undersigned parties have agreed to associate themselves as partners for the purpose of carrying on the Herreid Insurance Agency of Herreid, South Dakota.

The name, title and style of such partnership shall be the Herreid Insurance Agency of Herreid, South Dakota, which Agency is to conduct and carry on a general Insurance business.

The said Agency shall be directed and supervised by the Bank Directors, who shall appoint the agents to operate the agency and said Bank Directors, shall have the supervision of the finances of said agency, regulate the agency, and make the necessary reports or that same be made by their direction to the partners herewith associated.

Be it further stipulated and agreed that any stockholders selling his bank stock also sell his interest or share in the Herreid Insurance Agency to same purchaser at book value.

IN WITNESS WHEREOF, we have hereunto set our hands and seals the day and year above written.

On June 13, 1944, Bank and Insurance were controlled by the following persons who each owned 12 shares of stock in Bank and a one twenty-fifth interest in Insurance:

| | | |
|---|---|---|
| R. B. White | William Jahraus | Edwin Bollinger |
| J. J. Rieker | Edward Beck | Jacob G. Hofer |
| George E. Bickel | Joseph J. Seiler | Fred Scherle |
| Joe Wolf | Alex Kurtz | John Traxinger |
| Andrew Huber | Matt Seiler | William Block |
| John K. Wiest | Louie Stellflug | Esther J. Werner |
| Jacob Schmidt | Dave Huber | Karns A. White |
| W. O. Olsen | Herman Klaudt | John Vojta |
| Henry P. Ochsner | | |

At the time Insurance was formed, its partners agreed that each of the 25 partners was to share equally the profits and losses of Insurance.

On March 22, 1944, 3 days after the incorporation of Bank, the shareholders (except for John Traxinger) agreed that each would give the other shareholders first option to purchase any interest in Bank that any shareholder put up for sale, the price to be determined by a formula set forth in a document executed on March 22, 1944.

Since June 13, 1944, the partners in Insurance were also stockholders of Bank (with one exception, set out below) and the interest of each person equaled the interest of each other partner-stockholder. Unless stated otherwise, "stockholders" hereinafter refers to stock-

holders of Bank and "partners" hereinafter refers to partners of Insurance.

In January of 1951 the 24 other stockholder-partners purchased John Traxinger's interest in Insurance for $200 and his stock in Bank for $4,373.16. They contributed personal funds in equal shares to Insurance's Special Account (described below) from which account checks were issued to Traxinger. They caused the acquired Traxinger bank stock to be registered in the name of Herreid Insurance Agency. At the same time they bought Traxinger's interest in the Herreid Realty Company.

The next change in interests in Bank and Insurance came about as a result of the death of R. B. White in the fall of 1955. Prior to his death, White had assigned all of his assets to his wife, Anna. The White heirs were concerned about the effect of the restrictive sale provisions in the partnership agreement and shareholders agreement of March 22, 1944, upon the transfer of his bank stock and interest in the partnership, and inquired about the matter in early November 1955.

The stockholder-partners discussed the effect of the restrictive transfer agreements at their annual meeting in January 1956. They then orally agreed that neither agreement would operate on transfers to heirs and agreed to admit Anna White as an equal stockholder-partner.

Anna White died October 26, 1956; William Jahraus died in 1956; and Edwin Bollinger died on February 23, 1957. In each case the decedent's Bank stock was transferred to his heirs who were admitted to the partnership in the place of the decedent and received their shares of subsequent partnership distributions of income, all in accordance with the general policy adopted at the January 1956 meeting.

The board of directors of Bank, on September 12, 1944, decided to purchase the Herreid Insurance Agency (the agency Block had operated with Herboldt prior to the creation of Insurance) from Block at an agreed price of $375, instructed Bank's secretary to draw a check for that amount, payable to William Block, from the Insurance Account, discussed the matter of purchasing the Schirber Insurance Agency, and appointed a committee of W. O. Olsen, R. B. White, and Joe Wolf to contact Mary Brandner and discuss the purchase of that agency. Block was paid the $375 from Insurance's Special Account on December 11, 1944.

On December 12, 1944, Bank's board of directors approved the purchase of the Schirber Insurance Agency from Mary Brandner for the agreed price of $125. She had been paid by a check dated November 21, 1944, signed "Insurance Account, Wm. Block."

The partners did not contribute capital to Insurance. Capital is not a significant requirement in an insurance agency of the sort run by Insurance. Other than Block, the partners did not contribute

time or "know-how," except that some of them did give Block and Insurance's employees leads as to possible customers.

Bank's board of directors on January 9, 1945, approved and adopted the following salaries for its officers:

|  | Bank salary | Insurance compensation |
|---|---|---|
| William Block_____ | $200 per month__ | 10% of insurance commissions. |
| H. P. Ochsner_____ | 175 per month__ | 7½% of insurance commissions. |
| Esther J. Werner_____ | 150 per month__ | 7½% of insurance commissions. |

From March 1944 to the beginning of 1945, Bank's board of directors managed and directed Insurance.

In December 1944, Bank was examined by the South Dakota State Bank Department, whose report of this examination referred to the insurance activity at the bank and advised Bank that the two businesses could not be carried on together. After receiving this report, and about a year after Bank was organized, the partners decided that they would no longer permit Insurance to be managed by Bank's board of directors and appointed Block as manager of Insurance. In that post he was to receive 25 percent of the insurance commissions and have authority to hire the help and the agents he needed to assist him and to divide the commissions with them as he saw fit.

Insurance's articles of copartnership were not amended in writing until 1958 to remove therefrom the provision granting management powers to Bank's board of directors. However, for the period commencing after 1945 through the last taxable year before the Court there is no record in Bank's minute books of any action of its board of directors or stockholders pertaining to the management and direction of Insurance.

Insurance, during the years before the Court, was party to insurance agency contracts which authorized it to sell insurance at agreed premium or commission rates of remuneration, with and for the following insurance companies:

Anchor Casualty Company
American Equitable Assurance Company of New York
American National Fire Insurance Company
Boston Insurance Company
Bankers Life Company
Continental Insurance Company
Central Standard Insurance Company
Employers Protective Association
Globe and Republic Insurance Company
Home Insurance Company of New York
Hartford Accident and Indemnity Company
Hartford Fire Insurance Company
Motor Vehicle Casualty Company
Minnesota Farmers Mutual Insurance Company
Minnesota Mutual Fire and Casualty Company
New York Fire Insurance Company of New York

North Central Life Insurance Company
Pennsylvania Fire Insurance Company
Queen City Fire Insurance Company
United Fire and Casualty Company
United Casualty Company
Western Casualty and Surety Company
Western Fire Insurance Company
Western Assurance Company
Western Surety Company
Sunshine Mutual Insurance Company
St. Paul Fire and Marine Insurance Company
Security General Insurance Company
Springfield Fire and Marine Insurance Company

Bank was not a party to any insurance contracts, except those it purchased from Insurance.

Bank purchased seven insurance policies from Insurance in 1954; one blanket bond and seven insurance policies in 1955; six insurance policies in 1956; and five insurance policies in 1957, and paid Insurance the usual and regular premium charges for the type of coverage purchased. Bank's payments to Insurance on account of purchases from Insurance and Insurance's income from operations for the taxable years before the Court follow:

|  | Bank's payments to Insurance | Insurance's income from insurance activities |
|---|---|---|
| 1954 | $224. 74 | $11, 952. 00 |
| 1955 | 1, 613. 81 | 14, 059. 00 |
| 1956 | 179. 49 | 13, 913. 80 |
| 1957 | 313. 97 | 14, 811. 65 |

At the time of the trial, Block was cashier and secretary of Bank, as well as a stockholder of Bank. He was also managing partner of Insurance and licensed to sell insurance in South Dakota.

Insurance employed three persons during the taxable years before the Court—Lloyd Klaudt (hereinafter sometimes referred to as Klaudt), John Riedlinger (hereinafter sometimes referred to as Riedlinger), and Maynard E. Wittmeier (hereinafter sometimes referred to as Wittmeier). Riedlinger and Wittmeier were licensed to sell insurance in South Dakota. Klaudt, Riedlinger, and Wittmeier were neither stockholders in Bank nor partners in Insurance. All three were also employees of Bank.

Klaudt, Riedlinger, and Wittmeier were hired for Insurance by Block as manager. Riedlinger was hired by Insurance about 1½ years after he was hired by Bank for bank work. Prior to his employment by Insurance, Riedlinger went through a training period for insurance work supervised by Block. Wittmeier was hired by Block for Insurance about a year after he was hired by Bank for bank work.

Insurance paid Block, Klaudt, Riedlinger, and Wittmeier commissions. These payments were made from the Herreid Insurance Agency Special Account, along with distributions to partners.

Riedlinger performed the administrative work of Insurance—soliciting insurance, issuing policies, servicing losses, making reports to companies, taking care of correspondence and other matters pertaining to the insurance business—and was assisted in the work by Wittmeier.

The licensed agents employed by Insurance processed applications for insurance; countersigned policies issued; collected premiums on these policies; and deposited these premiums in Insurance's bank account.

Insurance maintained policy registers, policy expiration files, loss files, and correspondence files with insurance companies. Block, Riedlinger, and Wittmeier made the entries in those records.

Insurance had its own bank accounts at Bank, namely: The Herreid Insurance Agency Account, used to deposit general insurance premiums received and to pay net premiums to companies; the Herreid Insurance Agency Special Account; and three accounts, entitled Hail Insurance, Credit Life Insurance, and Farm Group Insurance, for premium deposit. At the end of each year, the approximate net commission earnings in the four accounts other than the Special Account were transferred to the Herreid Insurance Agency Special Account for later distribution to partners and licensed agents. Net premiums due companies on insurance sold were remitted out of the Herreid Insurance Agency Account, which the agents considered the operating account of Insurance.

Insurance clients made their checks for premiums payable to Herreid Insurance Agency, except that about a dozen checks each year were received payable to Bank. All checks made payable to Bank were endorsed "Herreid Insurance Agency" and deposited to the particular accounts of Insurance in which they belonged.

Insurance reported its net insurance commission or premium income on partnership Federal income tax returns which it filed with the director of internal revenue at Aberdeen, South Dakota, for each of the years 1944 through 1957.

The daily statement books of Bank, which are Bank's records of its income, do not show or reflect anywhere the receipt of insurance premium income by Bank.

In the years 1954 through 1957 Insurance maintained its desks, cabinets, and records and conducted business in the premises occupied by Bank and leased by it from the Herreid Realty Corporation, whose stockholders were the same persons as the partners in Insurance and the stockholders of Bank. Insurance had no lease and paid no rent.

Bank's leases stated the purpose of its occupancy of the premises to be the conduct of a general banking business. In a lease dated June 13, 1944, the purpose of Bank's occupancy was stated to be to operate a general banking and insurance business. This lease expired in 1949.

On the outside of the building there was a sign "Campbell County Bank," but no indication that Insurance also occupied the premises. Inside there was a sign "Herreid Insurance Agency." Bank advertised in a farm directory that Insurance services were available. Insurance had a separate advertisement in that directory and maintained a separate listing in the local telephone directory.

Insurance did not withhold employment tax or Federal income taxes from the commissions paid to its employees. Bank did withhold such items from the salaries of its officers and employees, including those doing insurance business.

Insurance relied upon Bank to pay Insurance's advertising, telephone, rent, office supplies, and postage expenses. Records kept of telephone calls indicate that approximately 20 percent of Bank's telephone bills during the years before the Court arose out of calls made by or for Insurance.

During the calendar years 1954 through 1957 some of Bank's business equipment, for which it claimed depreciation on its Federal income tax returns, was used by Insurance. These items included adding machines, desks, typewriters, and a check protector.

General items of expense, including depreciation, concerning items used by Insurance do not appear on Insurance's partnership information returns for the years 1954 through 1957.

All the expenses for heat, light, maintenance, and upkeep of the premises occupied by Bank and Insurance for the periods in question were paid by Bank.

Insurance did not carry liability insurance on the premises occupied by it. Bank furnished such liability protection. Insurance did not carry workmen's compensation insurance on its employees. Bank carried workmen's compensation insurance on its employees, including those doing insurance business. During the years before the Court, Bank employed on its premises about three persons in addition to Klaudt, Riedlinger, and Wittmeier.

The general bank charges for maintaining a checking account in Bank is a minimum of 25 cents per month. Insurance, in common with municipalities, churches, and fraternal organizations, was not charged a service fee by Bank for maintaining its five accounts. Insurance purchased and paid for its printed checks.

An insurance client who also maintained a checking account in Bank might have his bank account debited when paying an insurance

premium to Insurance. When small refunds or premium cancellations were paid to these depositors by Insurance, their accounts with Bank were credited. Posting of these bookkeeping entries was done by Bank's employees.

Respondent's determinations regarding the relationship of the insurance business to petitioner were set forth in the deficiency notices in substantially the following form with regard to each of the years before the Court:

On your income tax return for the year 1954 [1955, 1956, 1957], you failed to include income from the operation of an insurance business in the amount of $8,964.00 [$10,544.25, $10,435.35, $11,108.74], which amount, it is determined, represented taxable income to you.

In the alternative, if it is redetermined that said amount is not includible in your taxable income, it is determined that $6,181.37 [$6,839.29, $7,565.38, $7,266.78] of the business expenses claimed on said return are not deductible by you as ordinary and necessary business expenses and your taxable income for such year is accordingly increased by said amount.

OPINION.

## Issue 1.

Respondent maintains that Insurance's purported separate existence is a sham, that there is no distinction in practice between Bank and Insurance, and that Bank and Insurance were operated as one for all but tax purposes. Petitioner maintains that Insurance was organized because State law forbade Bank to engage in the insurance business, that Insurance carried on functions different from those carried on by Bank, and that the insurance income was earned by Insurance.

We agree with petitioner.

South Dakota forbids banks from engaging in any business activity other than banking.[3] A bank which carries on other activities is liable to loss of its charter.[4] Under South Dakota law, therefore, the two types of activities (banking and insurance) are required to be performed by separate entities. It is clear that Bank's incorporators had a substantial business purpose, wholly apart from Federal in-

---

[3] S. Dak. Code, sec. 6.0304 (1939).

Articles of Incorporation approved by Superintendent before filing; application for establishment of bank required; investigation.

Such application shall not be approved if the provisions of law relating to banks have not been complied with, or if the corporation has been organized for malicious or speculative purposes, *or for any purpose other than the legitimate business of banking:* * * * [Emphasis supplied.]

[4] S. Dak. Code, sec. 6.0604 (1939).

Unsafe or unlawful bank operation; liquidation by order of Superintendent.

The Superintendent may take possession of the assets and affairs of any bank and liquidate the same whenever it shall appear to him that any such bank has violated its charter or any law of this state, * * *

come taxes, for creating a separate entity to engage in the insurance business.[5]

Respondent has attempted to show that the above-noted statutes have been circumvented (with what degree of success we are not told) by other South Dakota banks "whose employees are licensed to sell and do conduct insurance business and whose income derived from the said insurance business is treated as income of the Bank." The fact that Bank's stockholders might have chosen that approach and thereupon subjected Bank to an additional tax liability is not helpful to the decision of this case. This Court previously has had occasion to comment:

It seems to us to be fundamentally unsound to determine income tax liability by what might have taken place rather than by what actually occurred. Even though the practical effect may be the same in either case, the resulting tax liability may be quite different. [*Anna M. Harkness*, 1 B.T.A. 127, 130 (1924).][6]

In *Miles-Conley Co.*, 10 T.C. 754 (1948), affd. 173 F. 2d 958 (C.A. 4, 1949), the sole stockholder of a corporation (except for 2 qualifying shares held by members of his family) which acted as a commission merchant and wholesaler in the produce industry, organized a sole proprietorship to take over the vegetable business of the corporation. The corporation continued its fruit business. The same personnel who were involved in the operations of the corporation were now involved in the operations of both businesses. This Court noted (p. 763):

The result of this transaction was to reduce the income of the corporation, and also to reduce the amount of taxes collected by the Commissioner of Internal Revenue. However, we know of nothing in the Internal Revenue Code, and no cases have been called to our attention, which would justify a disregard of the existence of a sole proprietorship because of any lack of business purpose *quoad* the corporation. In the instant case we assume, *arguendo*, that the purpose of A. Carlisle Miles in causing the petitioner to relinquish its dealing in vegetables and in organizing and conducting the business in vegetables as a sole proprietorship was not to further the best interests of the corporation, but was to further his own best interests (including the minimizing of total taxes payable by him and his controlled corporation). We are, nevertheless, unable to conclude that these assumed facts compel us to merge the actuality of the sole proprietorship into the fiction of the corporation for tax purposes, or to disregard A. Carlisle Miles as a separate taxable entity. * * *

---

[5] Respondent's contention on brief that "when state law conflicts with the Statutes of the Internal Revenue, the former must yield" is beside the point. The above-noted South Dakota statutes are relevant to this issue only to show the existence of some business purpose (other than the saving of Federal income taxes) for conducting the insurance business through an entity other than Bank. See *Edwards* v. *Chile Copper Co.*, 270 U.S. 452, 453–454, 456 (1926) ; *Moline Properties* v. *Commissioner*, 319 U.S. 436, 438 (1943) (quoted *infra* in text) ; *Ray Waits Motors* v. *United States*, 145 F. Supp. 269, 274 (E.D. S.C. 1956).

[6] To the same effect see *Gus Russell, Inc.*, 36 T.C. 965 (1961), and cases there cited.

It is not enough to show that a taxpayer might have utilized one method rather than another in order to achieve his business purposes. A corporation which is the alter ego of its sole stockholder is nevertheless to be taxed as a separate entity (*Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943)), even though the taxpayer could have conducted his business as an individual and thereby avoided the corporate layer of income taxation. It is even less sufficient to show that two business organizations are owned by the same persons and expect us to conclude from the close relationship that may be expected to result that the two are one and the one is the business organization which would pay the greater tax. *First National Bank of Sleepy Eye, Minn.*, 7 B.T.A. 84 (1927).

Where the close relationship between two organizations results in an improper allocation of income or expense items, the respondent's remedy is by way of reallocation. Any such improper allocation is not, however, conclusive as to the issue of separate identity. See *Abe Ackerman*, 27 B.T.A. 413 (1932), affd. 76 F. 2d 833 (C.A. 7, 1935).

However, that does not, by itself, solve the problem posed by this issue. We have found that Insurance operated pursuant to a formal partnership agreement. It entered into agreements with insurance companies either in its own name or in those of its managing partner or principal employees. It was an agent of insurance companies, not of Bank. It sold insurance to Bank but there is uncontradicted testimony which we accept (see *Jay A. Williams*, 28 T.C. 1000, 1001–1002 (1957), and cases there cited) that the usual fees were charged. Since Bank's total insurance expenses were only a small part of Insurance's total income, it is clear that most of Insurance's sales were to customers other than Bank. Cf. *Forcum-James Co.*, 7 T.C. 1195 (1946), remanded per stipulation 176 F. 2d 311 (C.A. 6, 1949); *R. O. H. Hill, Inc.*, 9 T.C. 153 (1947). Insurance carried on a business separate from that of Bank.

Respondent "relies chiefly upon the minutes" of Bank's board of directors in 1944 and 1945 regarding Bank's control of Insurance to show that Insurance was not really a separate business enterprise, but the earliest taxable year before the Court is 1954 and petitioner's witnesses testified that Bank has exercised no control over Insurance since 1945. No mention of Insurance's affairs appears in post-1945 minutes of corporate meetings. The record discloses no evidence justifying a conclusion that Bank's directors deliberately falsified the minutes of their meetings for over a decade in order to conceal this vital relationship. On the basis of the whole record and our findings of fact we conclude petitioner has established that its board of directors did not exercise control over Insurance during the taxable years before the Court.

We hold that the principles enunciated in *Moline Properties* v. *Commissioner*, *supra*, and *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), cases cited by neither party, are controlling here.

*Moline* involved an individual who maintained that his wholly owned corporation was not taxable as an entity separate from himself. The Court found that the corporation, which was created primarily as a security device to hold mortgaged property purchased for its sole stockholder, had a tax identity distinct from its stockholder. In the course of its opinion at pages 438–439, the Court laid down the following test:

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation [2] or to avoid [3] or to comply with [4] the demands of creditors or to serve the creator's personal or undisclosed convenience, [5] so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Footnotes omitted.]

In *National Carbide*, three wholly owned subsidiaries entered into contracts with their parent corporation purporting to make the subsidiaries agents of the parent, to which they were required to remit all profits in excess of 6 percent of their stated capital. During the year in question, the subsidiaries owned assets worth nearly $20 million, had net sales of approximately $22 million, and earned nearly $4,500,000 net. They claimed they should be taxed on only the $1,350 they retained. The subsidiaries relied on *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330 (1918), in which the Supreme Court had held that a parent corporation and its wholly owned subsidiary should be treated as being identical for the purposes of the Income Tax Act of 1913 because of the complete domination and control exercised by the parent of its subsidiary. Consequently, income earned by the subsidiary before March 1, 1913, was treated as having accrued to its parent prior to that date despite the fact that the actual transfer of dividends occurred subsequent thereto.

In *National Carbide*, the Supreme Court characterized (pp. 431–432) the effect of its *Moline* ruling as follows:

The theory upon which the Tax Court expunged the deficiencies apparently was that since the *Southern Pacific Co.* case was not expressly overruled by *Moline Properties*, the "business purpose" rule laid down in the latter is not absolute, but that the corporate entity may be disregarded (or the corporation treated as an agent of its owner) for tax purposes when the facts of ownership and control of the corporation approximate those presented by the *Southern Pacific* case. The Court of Appeals disagreed. It held that under our decisions, when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise. The court concluded

that "Even though Southern Pacific Co. v. Lowe, supra, set up a different test, we regard it as pro tanto no longer controlling."

The result reached by the Court of Appeals is clearly required by our later decisions. * * *

We see no reason why the test as to the existence of a separate taxable entity should vary depending upon which party argued for the recognition of the separate entity,[7] nor should the essentials of the test depend on whether the entity was a partnership or a corporation. *Seminole Flavor Co.*, 4 T.C. 1215, 1234 (1945).

The close relation between Bank and Insurance in terms of ownership, control, physical location, and use of Bank's employees by Insurance are relevant to this issue but are overbalanced by other factors. As noted above, there were business reasons for Insurance's existence as an entity separate from Bank; formally, Insurance existed separate from Bank; most of Insurance's business transactions were with others than Bank. Whatever may have been the intent of the partners in 1944, upon consideration of all the facts we conclude that prior to the start of the earliest taxable year before the Court the parties "in good faith and acting with a business purpose intended to join together in the present conduct" of Insurance as an entity separate from Bank. See *Commissioner* v. *Culbertson*, 337 U.S. 733, 742 (1949).

We conclude that petitioner has shown that, during the taxable years before the Court, Insurance was more than a "department" of Bank and that Insurance was a taxable entity separate from Bank. *First National Bank of Sleepy Eye, Minn., supra.*

This Court is not faced with the issue as to whether any part of Insurance's profit should be taxable to those partners who appear to have contributed neither capital nor services. There is no contention that Block, the only partner who contributed substantial services to Insurance, should be treated for income tax purposes as having earned all of Insurance's income. Rather, we are concerned with whether the partnership is sufficiently distinguishable from Bank so that the business form adopted by the partners will be recognized under the Internal Revenue Code as an entity separate from Bank. In view of the nature of the issue and the fact that Bank is not a partner in Insurance (although the disposition of Traxinger's stock made Insurance a stockholder of Bank), the holdings in the "family partnership" cases cited by respondent (*Commissioner* v. *Culbertson, supra; Commissioner* v. *Tower*, 327 U.S. 280 (1946)), in which profits of purported partnerships were held taxable to certain partners only, are not relevant.

---

[7] Of course, the burden of proof of identity or nonidentity would normally fall on the taxpayer, whichever side of the issue he took.

Similarly, respondent's citation of *Higgins* v. *Smith*, 308 U.S. 473 (1940), does not help us since we may refuse to give tax effect to any dealing between Bank and Insurance without necessarily finding that they should be taxed as one. Again, we may conclude that Insurance's allocation of distributive shares of income among its partners should be ignored, but *Higgins* v. *Smith* does not suggest that Bank and Insurance should be treated for tax purposes as being merely Bank. Cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945).

The mere fact of lack of arm's-length dealing between two businesses may strongly suggest that income or expense items were not properly allocated between them, as regards Federal income taxes, but it is not sufficient to show that two separate businesses should be taxed as one entity.

Respondent argues that even if we find Insurance was a taxable entity separate from Bank during the years in question he is nevertheless authorized by section 482 of the Internal Revenue Code of 1954 [8] to determine the true net income of Bank by allocating to it the income (apparently, the "net income") of Insurance.

In his statutory notice for 1956, respondent determined that a $439 loan interest item included by Insurance on its return should have been included instead by Bank. Petitioner assigned no error to this action. Apart from this item, we have found that Bank did not earn the money received and reported by Insurance. Under these circumstances, it would be "unreasonable, arbitrary, or capricious" (see *Grenada Industries, Inc.*, 17 T.C. 231, 255 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), and cases cited therein) to allocate to Bank Insurance's operating income derived from its activities as an insurance agency.

Based on the record as a whole, we conclude that, with the above-noted exception, Insurance's income for the taxable years before the Court is not properly taxable to Bank. On this issue we hold for petitioner.

## *Issue 2.*

Respondent's alternative position is that he may exercise his authority under section 482 to allocate deductions beween Insurance and Bank. Respondent calculated the amounts of the deductions claimed by Bank but properly the expenses of Insurance as follows:

---

[8] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

|  | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|
| 1. Gross income, insurance___ | $11,952 | $14,059 | $14,353 | $14,812 |
| 2. Gross income, bank_____ | 62,047 | 61,608 | 76,058 | 82,349 |
| 3. Total_____ | $73,999 | $75,667 | $90,411 | $97,161 |
| 4. Bank expenses, return_____ | $38,271 | $36,810 | $47,656 | $47,670 |
| 5. Ratio: Item 1 to item 3___ | 16.1514% | 18.5799% | 15.8750% | 15.2448% |
| 6. Expenses disallowed, item 4 times item 5_____ | $6,181.37 | $6,839.29 | $7,565.38 | $7,266.78 |

Since it is clear that Bank and Insurance are controlled by the same interests, the only issue is as to the amount, if any, of expenses properly allocable to Insurance that were taken by Bank on its return. That is an issue of fact as to which petitioner has the burden of proving respondent's determination is in error.

Petitioner's testimony on this subject is as follows:

Q. Mr. Block, in connection with the expenses of the insurance agency, do you know, did the agency pay all of its operating expense in the years 1954 and 1957?

A. No, they didn't.

Q. What expenses of the agency that you know of were either paid entirely by the bank or partly by the bank?

A. Some advertising, some telephone expense, rental space, pads, pencils.

Q. What about postage?

A. Postage, right.

Q. What is your estimate of the bank telephone expense, the per cent of the bank telephone expense which would probably be attributable to the agency?

A. About 20 per cent.

Q. What is your estimate of the bank postage expense which would be properly attributable to the agency?

A. Approximately ten per cent.

Q. And of the advertising?

A. About 20 per cent.

Q. The general office supplies?

A. Oh, probably $25 a year.

Q. In regard to the cost of occupancy, about what per cent of the bank work space does the agency work space cover?

A. Oh, I don't think that is over ten per cent.

Q. Would you say, in your opinion, that it would be proper to attribute to the agency ten per cent of the cost of occupancy of the bank building?

A. Yes, I would.

From this, petitioner concludes that the following amounts should be allocated to Insurance:

|  | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|
| Telephone | $58.42 | $45.21 | $59.10 | $69.51 |
| Postage | 123.96 | 101.80 | 109.61 | 105.30 |
| Advertising | 197.22 | 188.06 | 297.05 | 271.14 |
| Supply | 25.00 | 25.00 | 25.00 | 25.00 |
| Rent | 210.00 | 360.00 | 360.00 | 370.95 |
| Janitor | 19.25 | 16.53 | 19.07 | 37.66 |
| Heat-light | 62.01 | 64.28 | 62.37 | 72.35 |
| Total | 695.86 | 800.88 | 932.20 | 951.91 |

No explanation is offered as to the derivation of the percentages used by petitioner, except as to telephone expenses. Bank's concession that 20 percent of its deducted telephone expenditures were incurred by or on behalf of Insurance tends to corroborate rather than disprove respondent's determination with regard to expenses in general.

Petitioner has failed to sustain its burden of proving respondent's determination is erroneous or that it leads "to arbitrary and unreasonable results." *Leedy-Glover Realty & Insurance Co.*, 13 T.C. 95, 107 (1949), affirmed per curiam 184 F. 2d 833 (C.A. 5, 1950).

However, other issues settled by stipulation and deficiency items not contested by Bank have the effect of changing Bank's gross income or expenses and Insurance's income from insurance operations for several of the taxable years before the Court. We direct that the amount of Bank's expenses allocable to Insurance be recalculated according to the method used by respondent but after giving effect to the adjustments resulting from such stipulations and failure to contest.

Because of our holdings on the two disputed issues and in order to give effect to matters settled by stipulation between the parties and a deficiency item not contested by petitioner,

*Decisions will be entered under Rule 50.*