198

Spicer Theatre, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Copley Theatre, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 657–62, 658–62. Filed March 26, 1964.

*Samuel Goldman*, for the petitioners.
*Joseph P. Crowe* and *Gordon B. Cutler*, for the respondent.

Scott, *Judge:* Respondent determined deficiencies in these consolidated proceedings as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Copley Theatre, Inc. | 1958 | $13,264.11 |
| | 1959 | 1,933.43 |
| Spicer Theatre, Inc. | 1956 | 5,382.75 |
| | 1958 | 6,993.17 |
| | 1959 | 1,939.13 |

The issues for decision are:

(1) Whether respondent was correct in allocating to Spicer Theatre, Inc., the income and deductions (exclusive of a net operating loss carryover and a deduction for a franchise tax) reported by Copley Theatre, Inc., for the fiscal years ended January 31, 1958, and January 31, 1959, and

(2) Whether Copley Theatre, Inc., is entitled to a deduction in its fiscal years ended January 31, 1958, and January 31, 1959, of a net operating loss carryover sustained by it in its fiscal year ended January 31, 1954.

The deficiency determined in the income tax liability of Spicer Theatre, Inc., for its fiscal year ended January 31, 1956, results from the disallowance of a previously allowed net operating loss carryback

from its fiscal year ended January 31, 1958, which net operating loss is eliminated because of the inclusion in its income for that year of the income and deductions of Copley Theatre, Inc.

FINDINGS OF FACT

Some of the facts have been stipulated and such facts are incorporated herein by reference.

Spicer Theatre, Inc. (hereinafter referred to as Spicer), was incorporated under the laws of Ohio in 1947. Its principal office was at 99 Fourth Street NW., Barberton, Ohio, during the years in issue and its address last known to respondent as of December 8, 1961, was 3409 State Road, Cuyahoga Falls, Ohio. Copley Theatre, Inc. (hereinafter referred to as Copley), was incorporated under the laws of Ohio in 1945 and its principal office was located at 3409 State Road, Cuyahoga Falls, Ohio.

Spicer filed its Federal income tax returns for each of its fiscal years ended January 31, 1956, through January 31, 1959, inclusive, with the district director of internal revenue, Cleveland, Ohio. Copley filed its Federal income tax returns for its fiscal years ended January 31, 1954, and January 31, 1956, through January 31, 1959, with the same district director. Copley's accountant prepared a return for Copley for its fiscal year ended January 31, 1955, showing no gross income and deductions for taxes of $58.81, depreciation of $458.15, and other deductions of 83 cents with a resulting loss of $517.79. The accountant sent the original of this return by an office employee to the office of the district director of internal revenue in Cleveland, Ohio, with instructions that it be filed. The records of the office of the district director of internal revenue at Cleveland, Ohio, contain no record showing that a return was filed by Copley Theatre, Inc., for its fiscal year ended January 31, 1955.

In 1947 Copley constructed an indoor motion-picture theater at 850 Copley Road, Akron, Ohio, which it operated until February 1953. The theater was sold in 1953 at a substantial loss. In its fiscal year ending January 31, 1954, Copley sustained a net operating loss of $79,853.25. From the date of the sale of its theater to May 1, 1957, Copley conducted no active business. It did not report any gross receipts for the purpose of computing taxable income during this period, and no written minutes of any meeting of its board of directors were retained in its corporate records for this period.

For a number of years prior to April 1957, Spicer owned a leasehold in Akron, Ohio, upon which Spicer operated an outdoor drive-in motion-picture theater known as the Starlight Drive-In Theatre (hereinafter referred to as Starlight), and a fee simple interest in real property situated in the township of Northampton, county of Sum-

mit, Ohio, upon which Spicer operated an outdoor drive-in motion-picture theater known as Ascot Drive-In Theatre (hereinafter referred to as Ascot). All of Spicer's income for its fiscal years ended January 31, 1956 and 1957, was from its operation of Starlight and Ascot. Total income, total deductions, and taxable income reported by Spicer for each of these fiscal years are as follows:

|  | 1956 | 1957 |
|---|---|---|
| Total income | $146,199.58 | $156,423.08 |
| Total deductions | 114,591.04 | 122,432.26 |
| Taxable income | 31,608.54 | 33,990.82 |

The lease between Spicer and the owner of the property upon which the Starlight was located was dated January 1, 1951, and it was to run for a period of 9 years terminating December 31, 1959. Originally, the lease provided for a rental of $200 a month for the first 3 years, $225 a month for the next 3 years, and $250 a month for the final 3 years. By agreement dated July 30, 1956, the original agreement was modified to the extent that the monthly rentals were increased to $325 a month from August 1, 1956, to January 1, 1957, and to $350 a month thereafter until January 1, 1960.

The lease agreement provided, *inter alia:*

In further consideration of the foregoing terms of this lease, the parties hereto do severally and mutually agree as follows:

(1) That Lessee shall indemnify and save harmless the Lessor from and against all loss, liability or damage for injuries to persons or property sustained on said premises, and from all loss, liability or damage by reason of the operation of an outdoor theater by said Lessee, and further that it will obtain from a reliable insurance company, an Owner's Landlord's and Tenant's Liability Policy naming and indemnifying the Lessor therein as owner and further indemnifying her against any claims which may arise during the term of this lease or thereafter, the incident complained of having occurred during the occupancy of said property by Lessee, said policy of insurance to be deposited with said Lessor.

(2) That Lessee will permit no liens or other claims to be made against said property by reason of any improvements made on said property by it.

(3) That Lessee will pay all bills for water, gas and electric current used by SPICER THEATER, INC. at the time the same become due.

(4) That Lessee will fully comply with and obey all the laws, ordinances, rules, regulations and requirements of all lawfully constituted authorities, which in any way affect said premises or the use thereof, or this lease.

(5) Lessee shall be permitted to operate a concession stand on said premises during theater hours only, and shall erect no signs except such as advertise its theater and its productions, without the consent in writing from Lessor.

(6) That Lessee shall not assign this lease, nor said premises, nor any part thereof, nor shall it underlet, without the written consent of Lessor.

(7) That Lessee will remove everything it has placed or built on said premises at the end of said term or any extension thereof, and it shall surrender and deliver up said premises in the same condition substantially in which it now

is, except, however, that the projection booth which is built upon said property shall remain there as part of the realty and shall be the property of the Lessor.

(8) That Lessee will save Lessor harmless from any claim whatsoever that Dave Bass, his heirs or assigns, may have or make against Lessor or Lessee by reason of the fact that the description of the property herein leased may not be entirely accurate insofar as it relates to the exact line which separates the property of the said Dave Bass from the property of Lessor, or by reason of the fact that some of the property to be occupied by Lessee does, in fact, include property owned by the said Dave Bass.

(9) Lessee will promptly pay all taxes and assessments falling due and payable on said property during the term of this agreement, such payment to be made to Lessor upon written notice being given to Lessee by Lessor of the amount thereof.

(10) That if during the term of this lease as hereinbefore stated, Lessor decides to sell the property herein described, she will give Lessee the first opportunity to purchase.

(11) That at the expiration of the term of this lease, Lessor shall give Lessee the first opportunity to again lease said property for a term of nine (9) years, provided Lessee notifies Lessor by registered mail not less than one year prior to the expiration of the term herein granted of its desire to lease said property for said additional term. * * *

From the date of their incorporation throughout the years here involved, Rabb was president and general manager of Copley and Spicer. Prior to January 16, 1957, he owned 25 percent of the capital stock of each corporation and all of the remaining capital stock of each was owned by Estelle Albert, the wife of Sydney L. Albert. Under date of January 16, 1957, Sydney L. Albert, Estelle Albert, and the Susan Albert Trust, Sydney L. Albert, trustee (hereinafter called the Alberts), as sellers and Rabb and his wife as buyers entered into an agreement pursuant to which Rabb and his wife acquired the Albert's interests in a partnership known as the Highland Operating Co. and their interests in Acme Amusement Co., a corporation incorporated under the laws of Ohio as well as Estelle Albert's 75-percent stock interest in Spicer and Copley. The total consideration paid by Rabb was $110,000 in cash and notes plus the assumption of certain liabilities due the Alberts by Highland Operating Co., Spicer, and Acme Amusement Co.

The capital stock of Copley was not mentioned in the agreement of January 16, 1957.[1] On the same day that this agreement was executed, a special meeting of the board of directors of Copley was held. The minutes contain the following reference:

It was pointed out that the contracts had just been concluded for the sale by Sidney L. Albert, Estelle Albert and the Susan Albert Trust of all interest that any of them, and each of them, might have in and to Spicer Theatre, Inc.,

[1] The parties have, however, stipulated:

"Pursuant to the 'Agreement' [of Jan. 16, 1957, between Rabb and the Alberts], Edward Rabb acquired, among other interests, the 75% interest in Spicer's and Copley's capital stock owned by Estelle Albert."

Highland Operating Company and Acme Amusement Company, and that this now completed the acquisition by Edward J. Rabb and Beatrice Rabb of all the interests of the Alberts in all the Theatre and Amusement enterprises in which they had been interested together, and that resignations of Estelle Albert and Ben W. Holub, as Directors, had been prepared, signed and tendered. It was desired that with the formal acceptance of their resignations that new Directors be elected and qualified.

On May 1, 1957, a document entitled "Lease Agreement" was executed by Spicer and Copley whereby Spicer leased Starlight and Ascot to Copley for a period of 2 years at a rental of $48,000 per year. The lease provided, *inter alia:*

This lease agreement made and entered into on the 1st day of May, 1957, by and between SPICER * * * Lessor, and COPLEY * * * Lessee.

   *       *       *       *       *       *       *

1. Lessor does hereby let, lease and demise unto Lessee the following described premises, to-wit:

### STARLIGHT

   *       *       *       *       *       *       *

### ASCOT

   *       *       *       *       *       *       *

together with all buildings, improvements, equipment and other property now or hereafter located thereon.

(2) The term of this lease shall be for a period of Two (2) years commencing as of the 1st day of April, 1957.

(3) Lessee shall pay as rent for said premises, the sum of Four Thousand Dollars ($4,000.00) per month, payable in advance, on the 1st day of each month commencing with the 1st day of April, 1957.

(4) Lessor further covenants and agrees as follows:

a. To maintain the buildings in good condition and repair; and to repair or replace any of the leased buildings, improvements and equipment damaged or destroyed by fire, explosion, tornado, flood or other act of God.

b. To pay all taxes, assessments, and other charges on the premises including real estate taxes and personal property taxes.

c. To obtain and maintain in force adequate comprehensive insurance coverage on all buildings, improvements, fixtures and equipment herein leased.

d. That Lessor is well seized of and has good right to least [sic] the premises, will warrant and defend the title thereto, to the end that Lessee shall at all times during said term have the peaceable and quiet enjoyment and possession of said premises without any manner of let or hinderance from Lessor or any person or persons lawfully claiming said premises.

(5) Lessee further covenants and agrees as follows:

a. To maintain in good condition and repair the interior of the theater grounds and all existing fixtures and equipment and repair and replace any of the leased buildings, fixtures and equipment damaged or destroyed by any cause other than by reason of fire, explosion, flood, tornado or other act of God.

b. To obtain and maintain in force adequate coverage for personal liability and property damage insurance; Lessee further agreeing to have [sic] Lessor harmless from any and all loss, damage or expense incurred or suffered by reason of any claim for personal injury and/or personal property damage.

(6) It is mutually agreed as follows: That said Lessee shall have the right

and privilege of renewing the within lease agreement at the expiration of the original term for an additional period of Two (2) years.

The above agreement was arranged by Rabb upon the recommendation of a tax specialist whom he had consulted for the purpose of determining what he might do to take advantage of the operating loss Copley had sustained.

Spicer did not obtain written consent from the owner of the property on which the Starlight drive-in was located to the sublease to Copley.

After the execution of the lease agreement on May 1, 1957, Copley paid the stated rentals to Spicer. The drive-in theaters were operated with substantially the same equipment and employees as had been used prior to May 1, 1957. After May 1, 1957, all transactions concerning the operation of the drive-in theaters were entered in Copley's books of account.

For the periods April 1, 1957, through January 31, 1958, and February 1, 1958, through January 31, 1959, Copley reported the gross receipts from the operation of the Starlight and Ascot drive-ins on its Federal income tax returns and deducted as cost of operations the film rental, delivery, and booking costs, listing the balance as "Gross profit." Copley reported no other income. Copley deducted amounts designated as salaries and wages, repairs, interest, taxes, depreciation, and other deductions. Under the designation of "rents" it deducted the payments it made to Spicer. After these claimed deductions the taxable income reported by Copley prior to the deduction of the net operating loss was $36,084.82 and $6,444.77 for the years ended January 31, 1958, and January 31, 1959, respectively. Spicer on its Federal income tax return for its fiscal year 1959 reported as rents received the amounts equal to Copley's deductions under the designation "rents" ($48,000) and on its return for its fiscal year 1958 reported as "rents" received the amount of $42,000 as compared with a deduction by Copley under the designation of "rents" of $40,000.

Spicer reported taxable income of ($13,096.25)[2] and $2,749.42 for its fiscal years ended January 31, 1958, and January 31, 1959, respectively. For its fiscal year 1958 the only income reported by Spicer in addition to the "rents" from Copley was gross profit from operation of the Starlight and Ascot of $14,286.56 and for its fiscal year 1959 its only income in addition to the $48,000 reoprted as "rents" was $437.50 reported as "Miscellaneous."

Among the deductions claimed by Spicer on its Federal income tax return for its fiscal year 1958 was an amount of $14,909.89 designated as "Loss on Voluntary Razzing [sic] of Building." This building

[2] Loss.

was at the location of the Ascot Theatre. The health authorities had informed Spicer's officers that the building would have to be repaired to meet sanitary requirements and Spicer determined that the cost of razing the building and replacing it with a new building was less than the cost of the required repairs.

Prior to the execution of the lease of April 1, 1957, the assets and liabilities of Copley were as follows:

| | Jan. 31, 1956 | Jan. 31, 1957 |
|---|---|---|
| *Assets* | | |
| Cash | $45.77 | $5.73 |
| Notes and accounts receivable | 24,037.75 | 30,995.74 |
| Buildings and other fixed depreciable assets | 687.35 | 229.20 |
| Total assets | 25,670.87 | 31,230.67 |
| *Liabilities* | | |
| Bonds, notes, and mortgages payable | 70,925.00 | 77,032.99 |
| Accrued expenses | 343.69 | 343.69 |
| Capital stock | 12,000.00 | 12,000.00 |
| Earned surplus and undivided profits | (57,597.82) | (58,146.01) |
| Total liabilities | 25,670.87 | 31,230.67 |

The notes and accounts receivable shown in these assets were due to Copley from its shareholders or entities controlled by them. The bonds, notes, and mortgages payable shown in the liabilities were due from Copley to its shareholders or entities controlled by them.

After the execution of the lease, Copley obtained employers' identification numbers for payroll withholding purposes and for State unemployment taxes. During the years in issue, it filed unemployment returns with the State of Ohio with respect to the operation of Starlight and Ascot.

Respondent in his notice of deficiency to Spicer increased income as reported by Spicer in each of its fiscal years 1958 and 1959 by an amount designated as "Income assigned to Copley Theatre, Inc." with the following explanation as to fiscal year 1958:

(b) Under the authority of Section 482 of the Internal Revenue Code of 1954, all of the income and deductions reported by Copley Theatre, Inc. on its income tax return for the taxable year ended January 31, 1958, except the deduction for franchise taxes in the amount of $25.00, and the net operating loss deduction are reallocated to your income tax return for the taxable year ended January 31, 1958. (As an alternative, under the authority of Section 61(a) of the Internal Revenue Code of 1954, the gross income reported by Copley Theatre, Inc. for its taxable year ended January 31, 1958, arising from the assignment of your income from the operation of two outdoor theaters is held to be includible in your gross income for the taxable year ended January 31, 1958. Inasmuch as the income assigned has been held to be includible in your gross income, the expenses incurred in the operation of the two outdoor theaters claimed by, and allowed to Copley Theatre, Inc. are hereby made allowable as deductions from

gross income reportable by you. Accordingly, your taxable income has been increased in the amount of $36,109.82.)

The substance of respondent's explanation for the increase for its fiscal year 1959 was the same.

In his deficiency notice to Copley respondent disallowed the net operating loss deduction claimed by Copley in each of its fiscal years 1958 and 1959 with the following explanation for its fiscal year 1958:

(a) On line 33 of your income tax return for the taxable year ended January 31, 1958, you claimed a net operating loss deduction in the amount of $36,084.82 arising from the carryover of a net operating loss incurred for the taxable year ended January 31, 1954. It is held that under the provisions of Section 382(a) of the Internal Revenue Code of 1954, you are not entitled to a net operating loss carryover from a prior year. As an alternative, it is held that under the provisions of Section 269(a) of the Internal Revenue Code of 1954, you are not entitled to the net operating loss deduction claimed on the grounds that the acquisition of the stock of Copley Theatre, Inc. was made to evade or avoid income tax. Accordingly, taxable income is hereby increased in the amount of $36,084.82.

Respondent's explanation for the disallowance of the claimed deduction in Copley's fiscal year 1959 was in substance the same.

At the trial and on brief respondent recognizes that his determinations are inconsistent in that if he is correct in his allocation of Copley's income and deductions to Spicer, then Copley has no net income and therefore there is no deficiency in Copley's income for either year prior to the claimed net operating loss carryover.

#### OPINION

Respondent in his brief argues as his primary position that Copley is not entitled to the claimed net operating loss deductions for its fiscal years 1958 and 1959 and in the alternative contends that in the event this Court should hold that Copley is entitled to such deductions, the income and deductions reported by Copley are actually those of Spicer. Respondent does not concede error in either determination.

Respondent does not explain the basis of his position that if Copley is held not to be entitled to the claimed net operating loss deductions, the issue in the Spicer case is eliminated and in our view it would not be. However, if respondent is correct in his determination of Spicer's income, then Copley has no income for either its fiscal year 1958 or 1959, and the issue as to the deductibility of the net operating loss carryover becomes moot. We, therefore, consider the primary issue in this case to be whether Copley's income and deductions for its fiscal year ended January 31, 1958, and January 31, 1959, are properly those of Spicer for its similar fiscal years.

Section 482 of the Internal Revenue Code of 1954 [3] authorizes the allocation of income and deductions between related entities to prevent the evasion of taxes by the shifting of profits, the making of fictitious sales, and other methods usually used to "milk" a taxable entity. *Ballentine Motor Co.*, 39 T.C. 348, 357, affd. 321 F. 2d 796 (C.A. 4, 1963).

The Commissioner has considerable discretion in applying this section and his determinations thereunder must be sustained unless that discretion has been abused. *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953). It is the shifting of income from one controlled entity to another which the Commissioner is authorized to correct so that income and deductions are attributed to that entity which has earned or sustained them. *Grenada Industries, Inc., supra; Campbell County State Bank, Inc.*, 37 T.C. 430 (1961), reversed on other grounds 311 F. 2d 374 (C.A. 8, 1963). In the instant case the stipulated facts show that during the taxable years here involved Rabb and his wife owned all the stock in both Copley and Spicer. Therefore the necessary condition of section 482 of common ownership or control of these two entities is fully satisfied.

From the evidence it is clear that the sole reason for the lease by Spicer of the Starlight and Ascot theaters to Copley was to provide Copley with an income to enable it to take advantage of its net operating loss carryover. Rabb specifically stated in his testimony that this was the reason for the lease and the evidence fails to disclose any other reason. Therefore, there was no business purpose for the lease except the reduction of the total tax liability of Spicer and Copley by providing Copley with sufficient income from operation of the theaters theretofore operated by Spicer to enable it to use its net operating loss carryover. The lack of any purpose for a transaction other than tax avoidance strongly indicates that the overall plan was an arbitrary shifting of income among controlled businesses primarily for evasion of taxes justifying the Commissioner in making an attribution of the income and deductions to the party whose activities generated the income. *Ballentine Motor Co., supra.* The Commissioner's discretion may be exercised under section 482 to place controlled taxpayers on the same level with uncontrolled taxpayers dealing at arm's length. Sec. 1.482–1(b)(1), Income Tax Regs.

---

[3] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The common ownership and control of Spicer and Copley having been agreed to by the parties and the sole stockholder and chief officer of each of these companies having stated that the purpose of the transaction here involved was to reduce taxes, petitioner's primary contention is that the Commissioner's attribution of Copley's income and deductions to Spicer was arbitrary because Copley was the entity whose activities were responsible for the generation of that income. The evidence does not support this contention of petitioner.

Having acquired control of Copley and Spicer and obtained advice on how to best utilize the net operating loss of Copley for tax purposes, Rabb promptly arranged for Spicer to lease the profit-making drive-in operations of Starlight and Ascot to Copley under a 2-year lease running from April 1957 through March 1959 for a rental of $48,000 per year.[4] At that time, Copley was a dormant and an insolvent corporation. Had Spicer and Copley not been completely owned and controlled by the same persons no prudent businessman would have transferred the profitable operations of Spicer to Copley on a short-term lease basis where the rentals due could only be met out of the profits of the business transferred. The evidence fails to show that the lease agreement between Spicer and Copley had economic substance. Moreover, we were not persuaded by the testimony offered by petitioner that $48,000 a year represented a reasonable yearly rental for the Starlight and Ascot. The inference from the entire record is that the amount of the payments was geared to leaving sufficient income in Copley to absorb most of its net operating loss within the 2-year period of the lease, based on a projection of Spicer's profits for the same operations. Even if we were to assume that $48,000 represented a fair yearly rental for the Starlight and Ascot, it does not follow that the lease was a bona fide arm's-length transaction. It was Spicer's reputation and capital that had made these operations profitable, Spicer's facilities were used, and these facilities were operated with Spicer's personnel except that for purposes of reporting to Governmental agencies the employees were listed as being those of Copley. The only change made after the execution of the lease was the recording of the operations on Copley's books of account. The anticipated profits generated by Spicer's reputation and effort, when projected over the reasonably short term of the lease, properly can be primarily attributed to the activities of Spicer and not Copley. We reached a similar result in *Ballentine Motor Co., supra*, which involved the sale of inventory and the anticipated profits transferred therewith.

---

[4] Copley had the option of renewing the lease for an additional 2 years although there was no evidence that the option was exercised. Spicer was a lessee of the property on which Starlight was located and it did not have an automatic right to renew its lease for this property when the existing lease terminated Jan. 1, 1960.

The instant case is distinguishable from *T.V.D. Co.*, 27 T.C. 879 (1957), cited by petitioner. In that case, all of the stock of a successful soap manufacturer was sold to an acquiring corporation. The assets were then transferred and the acquired corporation was liquidated. There was no temporary shifting of the business assets and profits from one related taxpayer to another such as is present in the instant case. In that case we pointed out that the taxpayer had taken over a business that in the past had been profitable but that for all that appears of record, whether the business would continue profitable after the takeover was anybody's guess. In the instant case, Copley did not take over Spicer's business completely even for the 2-year period of the lease. Copley did not assume many of Spicer's obligations under its lease of the property upon which the Starlight was operated. Spicer was left with these and many other obligations and a rental fixed at an amount geared just to discharge them. Spicer's loss in its fiscal year 1958 resulted from an unusual circumstance, except for which so-called rental payments in that year as in its fiscal year 1959 would have just about equaled its expenses. Here the so-called rental for the 2-year period was fixed at an amount to insure substantially the desired profit to Copley over this 2-year period. As stated in *Ballentine Motor Co.*, *supra*, "We read *T.V.D. Co.* as resting on a finding that a tax avoidance scheme was not the primary motive of the transactions, and as standing for a 'business purpose' test, and as not in conflict with our holding here." The other cases relied upon by petitioners are also distinguishable on their facts from the instant case.

We sustain respondent's allocation to Spicer of the income and deductions reported by Copley.

Since after the allocation of Copley's income and deductions to Spicer, Copley is left with no income in either its fiscal year 1958 or 1959, we hold that there are no deficiencies in Copley's income tax for either of these years and do not reach the issue of the correctness of respondent's disallowance of the claimed net operating loss carryover.

> *Decision will be entered for respondent in docket No. 657–62 and for petitioner in docket No. 658–62.*