W. Braun Co., Inc. v. Commissioner.
W. Braun Co. v. Commissioner
Docket No. 5349-64.
United States Tax Court
T.C. Memo 1967-66; 1967 Tax Ct. Memo LEXIS 191; 26 T.C.M. (CCH) 342; T.C.M. (RIA) 67066; April 5, 1967
Jerome Kamerman, 500 5th Ave., New York, N. Y., for petitioner. Rudolph J. Korbel, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for the taxable year ended February 29, 1960, in the amount of $13,865.98. The *192 issues presented are whether the respondent erred in allocating to the petitioner, pursuant to section 482 of the Internal Revenue Code of 1954, taxable income reported by the petitioner's wholly owned subsidiary, and whether the respondent erred in disallowing as a deduction, under section 162 of the Code, a portion of salaries paid by the petitioner to two of its officers. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner was incorporated in 1946 under the laws of the State of New York and has its principal office in New York City. It is a wholesaler of various types of glass bottles, jars, and caps, primarily for use by manufacturers of cosmetics. The petitioner's Federal income tax return for the taxable year ended February 29, 1960, was filed with the district director of internal revenue for the Manhattan District of New York. The petitioner kept its books and filed its returns on an accrual method of accounting. At all times material the petitioner's capital stock was owned in equal proportions by Morris Braun, Julius Braun, Mary Braun, A. A. Friedberg, M. J. Tauger, and Mrs. *193 E. C. Erenberg. Morris and Julius Braun and Mrs. E. C. Erenberg are brothers and sister and Mary Braun is their mother. Friedberg and Tauger are not related to the Brauns. All such individuals, except Mary Braun, were directors of the petitioner. Morris Braun was its president, Friedberg and Tauger were vice presidents, and Julius Braun was secretary-treasurer. The petitioner's balance sheets showed a net worth of $102,771.30 and $119,233.84 at February 28, 1959 and February 29, 1960, respectively. The petitioner was the sole owner of the stock of Braunware Products Co., Inc. (hereinafter referred to as "Braunware"), which was incorporated in New York in 1956. At all times material the petitioner's officers and directors occupied the same positions as officers and directors of Braunware. Braunware sold at wholesale cosmetic travel packages and glass containers of the same type sold by the petitioner. It conducted its business on the petitioner's premises and used the petitioner's office, telephone and correspondence facilities. During its first taxable year, which ended July 31, 1957, Braunward sustained a net operating loss of $4,772.68 and it remained inactive thereafter until *194 November 1959. Its balance sheet showed net assets of $5,172.32 at August 1, 1959. Morris, Julius, and Mary Braun and Mrs. E. C. Erenberg also owned an Illinois corporation known as W. Braun Co. (hereinafter referred to as "Braun Chicago"). Braun Chicago was engaged in the sale at wholesale of bottles and glass products to manufacturers of pharmaceuticals and cosmetics and to others. Braun Chicago and the petitioner had a territorial arrangement under which the petitioner restricted its sales activity to the northeast section of the United States while Braun Chicago operated in the midwest section. The petitioner is primarily a selling organization, has no manufacturing facilities, and does not stock the merchandise it sells, except for samples of some types of glass containers carried in its catalog. Approximately 80 to 90 percent of the containers sold by the petitioner were purchased for it by Braun Chicago, which negotiated with the manufacturers and arranged for shipments to the petitioner's customers. The manufacturers of containers looked to Braun Chicago for payment, while the latter billed the petitioner at the cost charged by the manufacturers. The petitioner, in turn, *195 billed the customers. The petitioner paid Braun Chicago 2 percent of its (the petitioner's) net sales in the taxable year ended February 29, 1960, for the above services. Lanolin Plus, Inc., a cosmetics manufacturer, had its plant in Chicago until May 21, 1959, and was a customer of Braun Chicago until that time. On June 1, 1959, Lanolin Plus moved to Newark, New Jersey, and the petitioner began to sell to it. Friedberg was given the responsibility for sales to that concern and for credit and collections with respect to it. He undertook, at the request of Braun Chicago, to collect for that company the balance of about $250,000 owing from Lanolin Plus, of which about $54,000 was past due. In accordance with such request, Friedberg contacted officials of Lanolin Plus, and over a period of about 6 months succeeded in collecting the full amount. [1]
*196 In June 1959 the petitioner obtained a credit insurance policy from American Credit Indemnity Company of New York under which it was insured from June 1959 to June 1960 against loss, not exceeding $75,000 in the aggregate, resulting from the insolvency (as defined in the policy) of its trade debtors. Therein the accounts of specified debtors were insured for sums not in excess of various amounts, ranging from $5,000 to $25,000, and the Lanolin Plus account was insured for $75,000. The amount payable by the insurer was further limited to the "net loss" (as defined in the policy) sustained, less "coinsurance" and less the "primary loss" which was defined as the greater of 1/2 of 1 percent of total gross sales made by the petitioner from June 1959 to June 1960, or $7,500. The coinsurance in the case of the specified accounts was fixed at 20 percent of the net loss. Both Friedberg and Tauger, while recognizing that the Lanolin Plus account was a profitable account for the petitioner to have, were concerned about the risk entailed in dealing with Lanolin Plus because of the size of the account and some of the ventures that Lanolin Plus was engaged in. They thought that the business *197 of the petitioner, and consequently their individual interests in the petitioner, might well be destroyed if Lanolin Plus should become insolvent, and therefore wanted to eliminate the risk of such account. Both Friedberg and Tauger expressed their concern to Morris and Julius Braun. Friedberg recommended to them that the petitioner cease making shipments to Lanolin Plus and that the sales to Lanolin Plus be handled by the petitioner's inactive subsidiary, Braunware. The other officers of the petitioner agreed to Friedberg's suggestion. Petitioner ceased shipments to Lanolin Plus in September 1959, and in November 1959, Braunware commenced supplying Lanolin Plus. Friedberg continued to be responsible for sales to, and collection from, Lanolin Plus. An arrangement was effected under which Braun Chicago would make all purchases for Braunware, assume liability to the manufacturers for any purchases made, look solely to Braunware for payment, and receive 50 percent of Braunware's gross profits from sales to Lanolin Plus for the credit risk which it assumed. It was agreed that the petitioner would receive 2 percent of Braunware's net sales for the use of the petitioner's facilities, and *198 for the time spent by Friedberg on the Lanolin Plus account. Braunware had its own bank account and maintained books and records which were kept by an employee who was hired on December 4, 1959, at a salary of $40 per week. In formulating the plan to have sales to Lanolin Plus handled by Braunware, the petitioner did not have the advice of an attorney or an accountant. At that time Friedberg was aware of the fact that Braunware had an unused net operating loss which had been sustained in a prior year. He was also aware of the surtax exemption of $25,000 to which corporations were entitled. On September 21, 1959, the petitioner's credit insurance policy was amended to provide that sales made and losses sustained by Braunware were to be included in the coverage of the policy to the same extent as if the sales had been made by and in the name of the petitioner. Braunware had applied for credit insurance but was unable to obtain a policy because its sales were to be made to a single company. Braunware made its first billing to Lanolin Plus on November 17, 1959. On November 18, 1959, the petitioner's insurance policy was further amended, in consideration of an additional premium of *199 $1,809.49, to increase the insurance on the Lanolin Plus account to $150,000 from November 15, 1959 to June 1960. The additional premium was paid by petitioner, which was reimbursed by Braunware. The following tabulation shows the petitioner's total sales and its sales to Lanolin Plus during the taxable year ended February 29, 1960: Sales to
Lanolin
Period
Total Sales
Plus, Inc.
3/ 1/59-6/15/59
$ 437,743.67
0
6/15/59-6/30/59
81,075.49
$ 52,486.68
July 1959
162,243.42
15,575.15
August 1959
152,832.36
35,401.24
9/ 1/59-9/14/59
56,856.01
19,068.23
9/15/59-2/29/60
523,394.44
0
$1,414,145.39
$122,531.30
Sales to Lanolin Plus, cash receipts from it, and the balances in the Lanolin Plus account on the petitioner's books during the taxable year ended February 29, 1960, were as follows: Cash
Receipts
1959
Sales
Credited
Balances
June
$52,486.00
$ 326.00
$52,160.00
July
15,575.00
31,913.00
35,822.00
August
35,401.00
24,415.00
46,808.00
September
19,068.00
35,332.00
30,544.00
October
0
30,561.00
(17.00)
Braunware filed a return for the period August 1, 1959 to February 29, 1960, with *200 the district director of internal revenue for the Manhattan District of New York. Therein Braunware reported gross sales receipts of $103,364.71, all of which was from sales made to Lanolin Plus, taxable income of $17,208.48 before net operating loss deduction, a net operating loss deduction of $4,827.68, [2] and income tax liability of $3,714.24. The petitioner, in its return for the taxable year ended February 29, 1960, reported gross sales receipts of $1,400,290.97, taxable income of $23,461.25, and income tax liability of $7,038.58. The following tabulation sets forth the items shown on the above returns filed by petitioner and Braunware: Petitioner
Braunware
Gross receipts
$1,400,290.97
$103,364.71
Less: Cost of Sales
1,199,714.32
82,572.82
Gross profit
$ 200,576.65
$ 20,791.89
Other Income
8,480.32
1,250.83
Total Income
$ 209,056.97
$ 22,042.72
Deductions: Compensation of
officers
$ 60,500.24
Salaries and wages
48,948.02
$ 520.00
Rent
7,500.00
Taxes
6,879.02
1,053.25
Depreciation
12,053.94
Insurance
3,439.21
Other deductions
$ 48,342.58
$ 1,193.70
Intercompany re-
imbursement
* (2,067.29)
2,067.29 *
Total Deductions
$ 185,595.72
$ 4,834.24
Taxable Income
$ 23,461.25
$ 17,208.48 **
*201 In the notice of deficiency the respondent increased the petitioner's reported taxable income for the taxable year ended February 29, 1960, by $17,208.48, with the following explanation: It has been determined that you realized additional taxable net income from sales in the amount of $17,208.48 which you did not report on your return. [3]
The salaries which the petitioner paid to its officers during the taxable years ended February 29, 1956 through *202 February 29, 1960 were as follows: Taxable Years Ended
2/29/56
2/28/57
2/28/58
2/28/59
2/29/60
Morris Braun, President
$ 7,500
0
0
$ 5,000
$10,000.00
Julius Braun, Secretary-Treasurer
5,500
0
0
5,000
10,000.00
A. A. Friedberg, Vice President
14,638
$15,092
$15,057
14,999
20,250.12
M. H. Tauger, Vice President
12,615
13,084
13,050
14,999
20,250.12
The petitioner paid no dividends in the taxable years ended February 29, 1956 and February 29, 1960. In the taxable years ended February 28, 1957 through February 28, 1959, it paid dividends in the respective amounts of $3,500, $15,000, and $12,000. Friedberg and Tauger were employed full time by the petitioner. Friedberg was hired by the Brauns to run the petitioner which was organized to conduct the same type of business in the northeastern part of the United States as was conducted in the midwest by Braun Chicago. He handled routine problems which arose in connection with the conduct of the business, including sales and did a certain amount of creative selling. On matters of great importance or policy matters he would contact Julius or Morris Braun by telephone or personally *203 for advice and guidance. For example, he would not, of his own volition, undertake an extraordinary credit risk. Tauger's duties consisted of developing sales and managing the sales force. Morris and Julius Braun resided in Chicago and devoted over 50 percent of their time to their duties as president and vice president, respectively, of Braun Chicago. For each of the years 1955 through 1960 Braun Chicago paid salaries to Morris and Julius Braun of not less than $30,000 each. Morris and Julius Braun each made about 6 trips to New York in connection with the petitioner's business in the taxable year, each visit being generally of a week's duration. The services rendered to the petitioner by Julius Braun were primarily with relation to sales. Since 1918 he had been associated with Braun Chicago, which conducted the same type of business as was conducted by the petitioner, and had many contacts with high executives of large companies. He also, as treasurer of the petitioner, concerned himself with credit and fiscal problems of the petitioner. Morris Braun also had had much experience in the field. Over 50 percent of the petitioner's sales consisted of specially designed packages, as *204 distinguished from stock molds. Both Julius and Morris Braun rendered valuable services to the petitioner in conceiving new packaging designs to appeal to customers and prospective customers of the petitioner. Each carried on negotiations with customers and potential customers at the presidential or other high level, which made it possible for Friedberg and Tauger to further the sales of specially designed packages. The salaries of Morris and Julius Braun were fixed by agreement among all the officers of the petitioner. In fixing the salaries there was taken into consideration their efforts and the success attained as a result thereof. There was also taken into account the fact that they had in prior years rendered services for which they had not been paid. In determining the deficiency, the respondent disallowed as a deduction $10,000 of the amount claimed for officers' compensation, representing one-half of the compensation paid to Morris Braun and Julius Braun. The amount of $10,000 paid to Julius Braun and the amount of $10,000 paid to Morris Braun constituted reasonable compensation paid for personal services rendered by them to the petitioner. Opinion The first question *205 is the propriety of the respondent's allocation pursuant to section 482 of the Internal Revenue Code of 1954, [4] to the petitioner for its taxable year ended February 29, 1960 of the amount of $17,208.48 which had been reported by its wholly owned subsidiary, Braunware, as its taxable income before the application of a net operating loss deduction from prior years. The net income in *206 question was derived almost entirely from sales made by Braunware to one concern, Lanolin Plus, which account the petitioner had transferred to Braunware. The petitioner contends that such account was transferred to Braunware in order to insulate it (the petitioner) against any loss which might arise with respect to supplying that account, that the transfer was therefore for a valid business reason, and that the respondent's application of section 482 was not warranted. The respondent contends that his allocation was necessary in order to prevent evasion of taxes or clearly to reflect the income of the petitioner. It is his position that the account was transferred to Braunware in order to utilize Braunware's net operating loss carryover and to gain the additional advantage of a surtax exemption to which Braunware was entitled; that the petitioner's claim of a business purpose is without merit; and that the transaction whereby the Lanolin Plus account was transferred to Braunware was not an arm's-length transaction. In Asiatic Petroleum Co. v. Commissioner, (C.A. 2) 79 F. 2d 234, affirming 31 B.T.A. 1152, certiorari denied 296 U.S. 645, it *207 was stated with regard to section 45 of the Revenue Act of 1928, predecessor of section 482 of the Internal Revenue Code of 1954: Section 45 authorizes the Commissioner to make an allocation of gross income among businesses controlled by the same interests in order (1) to prevent evasion of taxes, or (2) clearly to reflect the income of any of such businesses. * * * The phrase "evasion of taxes" is broad enough to include the avoidance of the realization for taxation of such a profit through its transfer to another branch of the same business enterprise in a way which only changes its place in the business set up. That such was the meaning ascribed to it during the progress of the bill through Congress is evident from the committee reports which explain that evasion may be attempted "by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking.'" H. Rep. No. 2, 70th Cong., 1st Sess., p. 16; S. Rep. No. 960, 70th Cong., 1st Sess., p. 24. See, also, 69 Cong. Rec. pt. 2, p. 1068. The purpose of section *208 482 is not to punish the mere existence of the common control or ownership, but to assist in preventing distortion of income and evasion of taxes through the exercise of that control or ownership. Grenada Industries, Inc., 17 T.C. 231, affd. (C.A. 5) 202 F. 2d 873, certiorari denied 343 U.S. 819; and Ballentine Motor Co., 39 T.C. 348, affd. (C.A. 4) 321 F. 2d 796. In determining whether section 482 may be applied, the primary question is whether transactions between taxpayers owned and controlled by the same interests are carried out on the same basis as similar transactions would be carried out between uncontrolled entities. Ballentine Motor Co., supra; Nat Harrison Associates, Inc., 42 T.C. 601; and section 1.482-1 of the Income Tax Regulations.[5]
*209 In Grenada Industries, Inc., supra, we further pointed out: It has been said many times that the Commissioner has considerable discretion in applying section 45, and that the determinations required of him under the statute must be sustained unless that discretion has been abused. Our review of those determinations is not de novo, and we may reverse them only where the taxpayer proves that they are unreasonable, arbitrary, or capricious. See, e.g., G.U.R. Co. v. Commissioner (C.A. 7), 117 F. 2d 187, 189; National Securities Corp., 46 B.T.A. 562, 564, affd. (C.A. 3) 137 F. 2d 600, 602, certiorari denied 320 U.S. 794; Seminole Flavor Co., 4 T.C. at 1228. See also Spicer Theatre, Inc., 44 T.C. 198, affd. (C.A. 6) 346 F. 2d 704; Pauline W. Ach, 42 T.C. 114, affd. (C.A. 6) 358 F. 2d 342, certiorari denied 385 U.S. 899; and Hamburgers Yorkroad, Inc., 41 T.C. 821. Upon a careful consideration of the whole record we must conclude *210 that the petitioner has not shown that the respondent's allocation of Braunware's taxable income to the petitioner was arbitrary or unreasonable and that therefore it constituted an abuse of his discretion. A. A. Friedberg and M. J. Tauger, who each owned one-sixth of the stock of petitioner, testified to the effect that, because of the size of the Lanolin Plus account and in the light of their experience and knowledge of risks inherent in the cosmetic industry and some of the ventures in which Lanolin Plus was engaged, they were concerned about the danger which such account posed to the petitioner's business; that the business of the petitioner, and consequently their individual interests which they had built up over a number of years, might well be destroyed if Lanolin Plus should become insolvent; and that they recognized that the account was profitable but that they were willing to forego the profits on the account or minimize the profits in order to eliminate the risk involved. Friedberg testified that he conceived the idea of insulating the petitioner from any loss on the account by letting Braunware, the petitioner's dormant subsidiary which had assets of only about $5,000, *211 sell to Lanolin Plus and have Braun Chicago, in consideration of receiving one-half of the gross profits from the account, assume practically all the risk by making the purchases for Braunware to supply the needs of Lanolin Plus. He stated that he discussed the matter with the other officers of the petitioner who agreed with the decision to cease shipments to Lanolin Plus and permit Braunware to supply that account. We, of course, do not doubt that there was some risk inherent in the account but we think the record falls short of showing that the risk, considering the possibility of profit from the account, was so great as to have constituted the reason for the transfer of the account. The record shows that while Friedberg experienced some delay in collecting the balance of approximately $250,000, which had been owed by Lanolin Plus to Braun Chicago at the time the petitioner first acquired the Lanolin Plus account, that amount was collected in full. The record also shows that during the time the petitioner had the account it collected the full amount due from Lanolin Plus, in the amount of about $120,000. The record also contains Dun & Bradstreet reports which show that prior to *212 the petitioner's acquisition of the account Lanolin Plus had, with few exceptions, paid its obligations promptly, that it carried substantial bank balances, and that it had satisfactory banking arrangements. Furthermore, the petitioner, while it held the account, carried credit insurance, including $75,000 insurance on the Lanolin Plus account, which would protect it at least to some extent against any loss which might result from the account. The insurance on such account was doubled by the petitioner after Braunware took over the account. Friedberg and Tauger constituted the minority interest in the petitioner, the Braun family owning two-thirds of the stock. No member of the Braun family testified, and we therefore do not know the reason which impelled them to have the petitioner transfer the profitable Lanolin Plus account to Braunware. Such transfer shifted practically all the risk of the account to their family corporation, Braun Chicago. This would tend to indicate that they did not consider the risk involved in the Lanolin account as being disproportionate to the profit to be reasonably expected from that account. We think that the petitioner has not refuted the contention *213 of the respondent that the purpose of the petitioner's transfer of the Lanolin Plus account to Braunware was to take advantage of the net operating loss deduction which Braunware had available and Braunware's surtax exemption. While there is no evidence which specifically indicates that such was the purpose, the evidence does not affirmatively establish that such was not the purpose. The only evidence in the record which may be considered as directed to this subject was the testimony that the petitioner did not, in connection with the transfer, have the advice of an attorney or an accountant, but that Friedberg knew that Braunware had an unused net operating loss and that he was aware of the surtax exemption to which corporations are entitled. Accordingly, we conclude that the petitioner has not established that the respondent's allocation was not necessary in order to prevent "evasion of tax" within the contemplation of section 482. Furthermore, we must also conclude upon this record that the petitioner has failed to show that the allocation was not necessary in order clearly to reflect the income of the petitioner, within the meaning of section 482. The evidence falls far short *214 of showing that the petitioner, in transferring the Lanolin Plus account to Braunware, and in subsequently rendering service in connection therewith, dealt with Braunware at arm's length. Indeed, the evidence indicates to the contrary. We think it obvious, considering the profit which was made from the Lanolin Plus account, that the account had substantial value. Yet the record fails to show that Braunware paid petitioner any consideration whatever for the account. Furthermore, the record shows that in carrying out the sales to Lanolin Plus petitioner's facilities and personnel were used. Braunware had only one paid employee, a $40 a week bookkeeper. The petitioner did receive for the use of its personnel and facilities 2 percent of the net sales made to Lanolin Plus which amounted in the year in question to $2,067.29. This percentage was not arrived at by reference to the cost of servicing the account. Friedberg testified that it was not arrived at mathematically. It seems extremely questionable that this represented adequate consideration to petitioner in view of the fact that in the year in question the petitioner had total expenses of $185,595.72 which represented 13.3 percent *215 of its gross sales receipts, whereas Braunware's expenses, including the amount paid to the petitioner, amounted to only $4,834.24, or 4.7 percent of its gross sales receipts. In view of the foregoing, we approve the respondent's allocation of Braunware's taxable income to the petitioner. The remaining issue relates to the propriety of the respondent's disallowance as a deduction of $10,000 of the amount claimed as officers' compensation, representing one-half the compensation paid by the petitioner in the taxable year to Morris Braun, its president, and to Julius Braun, its secretary-treasurer. Section 162(a)(1) of the Internal Revenue Code of 1954 provides that there shall be allowed as a deduction a reasonable allowance for salaries or other compensation for personal services actually rendered. The respondent contends that compensation paid by the petitioner to Morris and Julius Braun was in each case unreasonable to the extent that it exceeded $5,000. The respondent on brief lays stress upon the fact that Julius and Morris Braun devoted most of their time *216 to their duties as officers of Braun Chicago, and spent only about 6 weeks in the taxable year in New York on business of the petitioner, and that the salary increase of $5,000 which they received in the taxable year in question over their salary in the prior year was approximately the same as the increase in salary received by Friedberg and Tauger, the vice presidents of the petitioner who devoted all their efforts to the petitioner's business. He states that, as majority stockholders of the petitioner, they were in a position to fix their salaries as they might desire, and contends that it has not been shown that the additional $5,000 paid to each of them constituted reasonable compensation for their services. We think the respondent was in error in disallowing the claimed deduction. The record establishes that while the Brauns spent only about 6 weeks time during the taxable year in New York in promoting the business of the petitioner, they directed the conduct of the petitioner's affairs and were consulted by Friedberg and Tauger concerning all important policy matters. The evidence further establishes that they rendered valuable services in conceiving and designing special packaging *217 and promoting sales by contacting customers and potential customers of petitioner at a presidential or other high management level. The petitioner presented the testimony of a management consultant who testified that in his opinion the salary of $10,000 paid to Julius Braun and the $10,000 salary paid to Morris Braun constituted reasonable salaries for the services which they performed. He stated that in the creative selling type of business in which the petitioner was engaged success hinges on the ability to create ideas which can be sold to prospective customers; that it is necessary, or at least helpful, to contact customers and prospective customers at the top management level; that there is not necessarily a direct correlation between the amount of time devoted to such efforts and the contribution made; that it was his understanding that Julius and Morris Braun rendered such services to the petitioner; and that in other companies persons rendering similar services received salaries much greater than $10,000. Upon a consideration of all the evidence, including the above opinion testimony, we have concluded and have found as a fact that the compensation paid by the petitioner *218 in the taxable year to Morris and Julius Braun constituted reasonable compensation for the services which they rendered to the petitioner. Decision will be entered under Rule 50. Footnotes
1. At the time petitioner took over the Lanolin Plus account, Friedberg received from Braun Chicago several Dun & Bradstreet, Inc. reports regarding Lanolin Plus. One of such reports refers to 12 accounts with suppliers and shows that all such accounts were paid within 10 or 30 days, except one which, on August 23, 1958, was past due in the amount of $4,000 and was "slow 60-90 days." Another of such reports refers to 13 accounts and shows that all of such accounts were paid within 10 or 30 days, except 3 which were considered "slow." In some instances the credit extended to the petitioner by its suppliers was in excess of $100,000. Such reports showed that Lanolin Plus carried substantial bank balances and that its banking relations were satisfactory.↩
2. The reported net operating loss deduction of $4,827.68 represented the carryover of net operating losses of $4,772.68, $25, and $30 reported for Braunware's taxable years ended July 31, 1956, 1957, and 1958, respectively. During the latter two years Braunware was inactive.↩
*. Represents 2 percent of Braunware's net sales. ↩
**. Before net operating loss deduction.↩
3. Prior to the trial the petitioner filed a motion to require the respondent to file an amended answer setting forth a further and better statement of the $17,208.48 adjustment, but the motion was withdrawn upon the respondent's agreement to supply the information sought in a stipulation of facts. The stipulation of facts provides in part as follows: Respondent takes the position in this proceeding that the additional income of $17,208.48 attributed by respondent to petitioner arises out of an allocation, pursuant to section 482 of the Internal Revenue Code of 1954↩, of the net income of Braunware to petitioner.
4. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
5. Section 1.482-1 of the regulations provides in part: (b) Scope and purpose. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. * * *
(c) Application. Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(a) of the regulations provides in part: (6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. * * *↩