ROGER M. DOLESE AND SUSAN B. DOLESE, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29240–81.     Filed May 30, 1984.

*Edward H. Moler*, for the petitioners.
*Osmun R. Latrobe* and *Michael O'Brien*, for the respondent.

JACOBS, *Judge*:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Deficiency |
| --- | --- |
| 1976 | $57,455.12 |
| 1977 | 151,077.00 |

---

*This case was reassigned from Judge Darrell D. Wiles to Judge Julian I. Jacobs for disposition by order dated Apr. 2, 1984.

This case involves the distribution of two tracts of land by a partnership to its two partners (an individual and his wholly owned corporation) followed by a partial gift/partial sale of the tracts to Oklahoma City (hereinafter sometimes referred to as the city). The distribution of each tract was disproportionate to the partners' interests in the partnership, and was made for the purpose of adjusting the partners' ownership interests in the land prior to their contribution and sale of such land to the city. The purpose of the disproportionate distribution was to maximize the available tax benefits flowing from the charitable contribution deduction available under section 170 to the partners.[1] Thus, the issues to be decided, after concession by the petitioners, are:

(1) Whether the respondent properly disregarded a disproportionate distribution of land by a partnership to its partners where such distribution was made solely to avoid the statutory limitations imposed on the charitable contribution deduction by a corporation;

(2) Whether the respondent properly reallocated between an individual and his wholly owned corporation gain from sales of land by such individual and corporation.

## FINDINGS OF FACT

The facts in this case have been fully stipulated and are so found.

The petitioners are Roger M. Dolese (hereinafter referred to as Roger) and his wife, Susan B. Dolese. Roger and his wife resided in Oklahoma City, Okla., at the time of filing the petition herein, and timely filed joint returns for the years at issue with the Internal Revenue Service Center at Austin, Tex.

At all times material hereto, (1) Roger owned all of the stock of the Dolese Co. (hereinafter referred to as the corporation), (2) Roger and the corporation were the only partners in Dolese Bros. Co. (hereinafter referred to as the partnership), and (3) the corporation held a 51-percent interest in the partnership, and Roger held the remaining 49-percent interest.

From 1973 until March 29, 1976, the partnership held title to approximately 160 acres of undeveloped land located at the

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

northwest corner of N.W. 50th and Meridian, Oklahoma City, Okla. (hereinafter referred to as the property).[2]

In November 1974, the partnership engaged an engineering firm to devise a plan for the development of the property and to obtain the necessary zoning. The firm developed a master development plan involving different uses of various parts of the property. In April 1975, the partnership submitted to the city a proposed community unit plan and an application requesting zoning for the master development plan. The community unit plan and zoning request provided for development of the property (except for approximately 3 acres to be used for an elderly housing project site) as duplexes, single-family homes, condominiums, and commercial areas, together with recreational[3] and common areas. The plan and the zoning request were approved by the Oklahoma City Council on September 20, 1975.

In the late summer of 1975, representatives of Roger and the corporation discussed with the director of parks of the city a possible gift by Roger and the corporation to the city of the east half of the property (containing approximately 67 acres and having a value of $1,376,240) and the simultaneous sale of the west half of the property (containing approximately 90 acres) to the city for its appraised value of $1,387,560. Hereinafter the west half of the property will be referred to as tract I and the east half as tract II.

Although Roger and the corporation were willing to contribute approximately one-half of the property to the city for use as a park, they desired to do so only if the amount of such a large contribution could be fully utilized as charitable deductions by the two donors. Roger and a vice president of the corporation discussed the proposed gift with tax advisers, and

---

[2] The corporation acquired the property on Sept. 29, 1948, for the purpose of removing sand for construction materials and related business uses. Excavation and concrete ready-mix batch plant operations on the site ceased during the 1960's, and the property was thereafter used only for open storage. The corporation contributed the property to the partnership by warranty deed, dated Dec. 1, 1972, and recorded with the clerk of Oklahoma County on Jan. 11, 1973.

[3] The Kerr Foundation, a philanthropic organization in Oklahoma City, became interested in developing a public park on a portion of the property. It approached officials of the city, on its own initiative and without the knowledge of Roger or the corporation, with regard to the city's acquiring the property and developing a park on it. Thereafter, the Kerr Foundation, on its own initiative and without the knowledge of Roger or the corporation, contacted the South Central Regional Office of the Bureau of Outdoor Recreation of the U.S. Department of the Interior with regard to obtaining a Federal grant to purchase that portion of the property to be developed as a public park.

were advised that the corporation could only claim a charitable contribution equal to 5 percent of its net income before contributions, certain special deductions and loss carrybacks. Roger, on the other hand, could deduct up to 30 percent of his contribution base. Although it was anticipated that the corporation's fiscal year ending March 31, 1976, would be exceptionally profitable, it was doubtful, based on the corporation's earnings history, that the net income of the corporation for 1976 and the succeeding 5 taxable years would be sufficient to utilize the full amount of the charitable contribution deduction if the property were owned by Roger and the corporation in the ratio of 49 percent and 51 percent, respectively.[4] Roger and the corporation were therefore advised that the portion of the property to be contributed to the city should first be distributed from the partnership to the two partners in the ratio of 75 percent to Roger and 25 percent to the corporation. On the basis of this advice, no consideration was ever given to the possibility of having the partnership make the contribution.

The city proposed to finance the purchase of tract I with Federal funds obtainable through the Bureau of Outdoor Recreation of the U.S. Department of Interior. On September 15, 1975, the city applied for such Federal funds. Prior to March 27, 1976, discussions between the city and representatives of Roger and the corporation had been with regard to the sale of tract I to the city for its appraised value, or $1,387,560, and a simultaneous gift of tract II to the city, both of which were to be consummated prior to March 31, 1976 (the last day of the corporation's fiscal year). On March 26, 1976, the mayor of the city informed a representative of Roger and the corporation that the city would not be able to obtain the

---

[4]The following schedule sets forth the taxable income and the charitable contributions reflected on the income tax returns of the Dolese Co. for the taxable years ending Mar. 31, 1970, through Mar. 31, 1975:

|  | Taxable income, per return as filed | Contributions, per return | Taxable income, before contribution |
|------|------|------|------|
| 1970 | $719,838.32 | $37,886.23 | $757,724.55 |
| 1971 | 2,083,100.37 | 29,914.35 | 2,113,014.72 |
| 1972 | 935,108.48 | 21,331.39 | 956,439.87 |
| 1973 | (42,670.28) | 0 | (42,670.28) |
| 1974 | 794,109.49 | 41,795.24 | 835,904.73 |
| 1975 | (193,368.34) | 0 | (193,368.34) |
| 1976 | 2,490,315.94 | 131,069.26 | 2,621,385.20 |

necessary funds to purchase tract I by March 31, 1976; therefore, it appeared the proposed partial sale/partial contribution of the property would not be consummated.

On March 27, 1976, a representative of Roger and the corporation discussed with the mayor the possibility of the city's acquiring tract I by gift, with no requirement that the city purchase the remainder of the property. During the next several days, the further discussions of the gift that ensued were expanded to include discussion of the possibility of the city's acquiring through purchase options the remainder of the property. During this same period, Roger and a representative of the corporation met with their tax advisers and counsel.

On March 29, 1976, the property was distributed by the partnership to Roger and the corporation by a warranty deed which divided the property into tract I (consisting of approximately 90 acres) and tract II (consisting of approximately 70 acres). The property, as so divided, was distributed to Roger and the corporation, as tenants in common, as follows:

Tract I - 76% to Roger
24% to the corporation

Tract II - 76% to the corporation
24% to Roger

On March 29, 1976, the date of the distribution, the partnership owned other properties and assets.

On March 30, the warranty deed was recorded; and immediately thereafter, Roger and the corporation contributed tract I to the city, with no commitment on the part of the city to purchase any part of tract II. On the date of the contribution, tract I had a fair market value of $1,387,560.

On May 4, 1976, Roger and the corporation granted the city options to purchase the remainder of the property, except for approximately 3 acres to be used for an elderly housing project. The options covered three parcels—one parcel containing approximately 51 acres, and the other two parcels containing 8 acres each.

In July 1976, Roger and the corporation sold the 51-acre parcel to the city pursuant to the city's option. The sales price for that parcel was $700,000, resulting in a long-term capital gain of $685,415.55.

In August 1977, Roger and the corporation sold the other two parcels (aggregating 16 acres) to the city. The sales price for those two parcels was $676,240, resulting in a total long-term capital gain of $667,508.

The petitioners' 1976 income tax return reflected a $1,054,546 contribution by Roger to the city, based on Roger's ownership of a 76-percent interest in tract I. The respondent determined that Roger's share of the gift to the city was $679,904, based on Roger's ownership of a 49-percent interest in tract I. In determining the alleged deficiency in 1977, the respondent reduced the amount of the charitable contribution carryover from 1976 to 1977 because of the aforesaid reallocation of Roger's ownership in tract I from 76 percent to 49 percent.

In addition to the aforesaid adjustments, the respondent increased petitioners' 1976 and 1977 incomes to reflect Roger's share of the capital gain from the sale of the 51-acre parcel to the city in July 1976, and from the sale of 16 acres to the city in August 1977 from 24 percent to 49 percent.

## OPINION

In order to avoid the potential loss of the tax benefit of a substantial charitable contribution deduction,[5] Roger caused the partnership (in which he and his wholly owned corporation were the only partners) to distribute in 1976 a 160-acre parcel of land in two tracts (of approximately equal value but not of equal size) to the two partners in ownership percentages disproportionate to their partnership interests. Prior to the distribution, Roger had (as a result of his interest in the partnership) a 49-percent interest in the land, and the corporation had (as a result of its interest in the partnership) a 51-percent interest. After the distribution, Roger had a 76-percent interest in tract I and a 24-percent interest in tract II; the corporation had a 24-percent interest in tract I and a 76-percent interest in tract II. Following the distribution (which

---

[5]As applicable for 1976, sec. 170 of the Internal Revenue Code of 1954 limited the amount of the charitable contribution deduction for a corporation to 5 percent of its taxable income for the year, with a 5-year carryover to subsequent years for any excess amount. For the years 1970–75, the aggregate maximum charitable contribution deduction available to the corporation would have been $221,352.26. A 51-percent ownership in tract I would have resulted in $707,655.60 ($1,387,560 × 51%) being potentially available as a contribution by the corporation to the city; whereas, a 24-percent ownership interest resulted in a $333,014.42 ($1,387,560 × 24%) contribution.

admittedly was done solely for tax purposes), tract I was contributed to the city, and the city acquired options to purchase substantially all of tract II. The city exercised one of its options in 1976 and another in 1977.

The petitioners contend that the disproportionate distribution of the tracts to Roger and the corporation should be respected for tax purposes, with the result that they would be entitled to a deduction for the contribution of tract I to the city on the basis of a 76-percent ownership interest in the donated tract and would recognize capital gains from the sale of tract II to the city on the basis of a 24-percent ownership interest. The respondent disagrees and has asserted deficiencies by decreasing the charitable contribution deduction claimed by the petitioners and by increasing their share of capital gains on the sale of the land to the city.

The respondent argues that the disproportionate distribution of the property by the partnership to its two partners should be disregarded for two reasons. First, he argues that the substance of the transaction, rather than its form, controls; and, therefore, the transaction should be viewed as if the contribution and sale to the city had been made by the partnership, as opposed to its partners. Roger's charitable contribution deduction and capital gain would then be determined in accordance with his 49-percent interest in the partnership. Second, the respondent argues that under section 482, he has the right to reallocate the amount of the charitable contribution deduction, and the amount of the capital gains, between the partners on the basis of their respective percentage interests in the partnership. A discussion of each of these two arguments follows.

### Substance Over Form

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). But as has often been stated, "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

The respondent argues that the partnership, rather than its partners, contributed and sold the property to the city. The facts in this case are otherwise.

The stipulated facts are: (1) Roger and the corporation always intended that they, in their individual capacities, would make a partial contribution/partial sale of the property to the city, and all discussions with the city were in the context of the contribution and sale being made by Roger and the corporation, as opposed to the partnership; (2) no consideration was ever given to having the partnership make the contribution or sale of the property to, the city; and (3) the partnership never committed itself, either orally or in writing, to make a gift or sale of the property to, the city.

Since the facts show clearly and beyond question that Roger and the corporation in their individual capacities, and not on behalf of the partnership, contributed and sold the property to the. city, we conclude that the respondent's first argument. must be rejected. The Supreme Court's decision in *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950), is apposite to our conclusion. That case involved an in-kind partial liquidation distribution from a closely held corporation to its shareholders followed by a sale of the distributed assets by the shareholders to a third party. A similar situation was involved in *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). In both cases, the Commissioner argued that tax at the corporate level resulting from the asset sale could not be avoided by using the shareholders "as a conduit through which to pass title." In *Cumberland*, the taxpayer prevailed because it was found that the corporation never negotiated the sale but rather the sale was negotiated by the shareholders. In *Court Holding*, the Commissioner prevailed because it was found that the corporation had in fact negotiated the sale but "called off" the sale at the last moment.

As previously stated, in the present case it is indisputable that Roger and the corporation acted on their own behalf, and not as a conduit on behalf of the partnership, in making the contribution and sale to the city. Simply because the parties for tax reasons rearranged their respective ownership interests in the property through the vehicle of a disproportionate distribution from the partnership prior to the contribution/ sale to the city does not change the fact that Roger and the

corporation, and not the partnership, contributed and sold the property to the city. As Justice Black stated in *Cumberland*:

Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution [here, a contribution and sale of land by partners following a genuine withdrawal of land from a partnership] cannot be attributed to the corporation [here, the partnership] for tax purposes. [338 U.S. at 455.]

We are convinced that the substance and form of the transactions involved in this case were as one; hence the Commissioner's first argument is rejected. *Bolker v. Commissioner*, 81 T.C. 782, 794–803 (1983).

## *Section 482*

Section 482[6] grants the Commissioner broad discretion to scrutinize closely transactions between mutually controlled taxpayers and, to allocate items of income, deductions, and credits where necessary to prevent the evasion of taxes or to ensure the clear reflection of each taxpayer's income. *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965), affg. 44 T.C. 198 (1964); *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); *Foster v. Commissioner*, 80 T.C. 34, 142–143 (1983). Where the Commissioner determines that an allocation under section 482 is necessary to prevent either tax evasion or the distortion of a taxpayer's income, his determination must stand unless the taxpayer proves that the determination is "unreasonable, arbitrary, or capricious." *Ballentine Motor Co. v. Commissioner, supra; Foster v. Commissioner, supra; Ach v. Commissioner*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966). A taxpayer contesting a section 482 allocation bears a "heavier than normal burden of proving arbitrari-

---

[6]SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

ness." *Foster v. Commissioner, supra; Young & Rubicam, Inc. v. United States,* 187 Ct. Cl. 635, 410 F.2d 1233, 1245 (1969).

In the present case, the respondent determined that the charitable contribution deduction and capital gain resulting from the contribution/sale of the property must be allocated in accordance with Roger's and the corporation's interest in the partnership in order to reflect clearly the petitioners' income. There is no dispute regarding the existence of the control relationship, and the petitioners admit that the disproportionate distribution was effected to allow the petitioners a larger tax deduction than would otherwise have been available. Petitioners, however, resist the application of section 482 on four other grounds.

Petitioners' first argument is that section 482 only applies where there are two or more "organizations, trades or businesses," and that this dual business requirement has not been met herein. Specifically, petitioners contend that Roger, as an employee of the corporation, has no independent trade or business under *Whipple v. Commissioner,* 373 U.S. 193 (1963), and *Foglesong v. Commissioner,* 691 F.2d 848 (7th Cir. 1982), revg. 77 T.C. 1102 (1981), and therefore cannot be subjected to a section 482 allocation. We disagree.

In the first place, petitioners overstate the Supreme Court's holding in *Whipple.* The taxpayer in *Whipple* sought a business bad debt deduction under section 165 for worthless loans to a corporation of which the taxpayer was the dominant shareholder. In holding that the debt was a nonbusiness bad debt, the Court concluded that the taxpayer's expected reward from the corporation was that of a return on his investment, and that the management services the taxpayer rendered the corporation, for which he received no salary, did not amount to a trade or business. 373 U.S. at 203. The Court, however, expressly stated that its holding did not extend to the question of whether the services rendered by a salaried corporate employee amount to a trade or business. 373 U.S. at 204.

We believe that a corporate executive who receives a salary for his services is engaged in a trade or business for the purposes of section 482. *Keller v. Commissioner,* 77 T.C. 1014, 1023–1024 (1981), affd. 723 F.2d 58 (10th Cir. 1983). See *Primuth v. Commissioner,* 54 T.C. 374 (1970); *Mitchell v. United States,* 187 Ct. Cl. 342, 408 F.2d 435 (1969). Roger, who

listed his occupation as "Executive" on his returns, received a salary from the corporation during the years in question, and therefore had income from a business (as opposed to investment) activity for section 482 purposes.

Petitioners, however, argue that the Seventh Circuit's opinion in *Foglesong* precludes a finding that Roger had a *separate* trade or business for the purpose of the dual business requirement of section 482. In *Foglesong*, the Seventh Circuit held that a section 482 allocation of income from a one-man personal service corporation to the shareholder-employee was improper because the dual business requirement was not satisfied where the shareholder-employee worked exclusively for the corporation and was engaged in the identical business as the corporation. Without expressing any views upon the merits of the Seventh Circuit's opinion in *Foglesong*, we believe that *Foglesong* does not apply to the present case. The respondent's determination does not involve an allocation of income and deductions from a corporation to its sole shareholder-employee as in *Foglesong*. Rather, the respondent here has allocated income and a deduction from Roger, as a partner, to the partnership. Roger is an investor in, and not a salaried employee of, the partnership. Roger's trade or business, that of rendering services to the corporation for a salary, is therefore separate and independent from the partnership's business activity.

The petitioners also argue that there was a "sound business purpose" for realigning the partners' interests in the tracts through the disproportionate distribution, and that, under *W. Braun Co. v. Commissioner*, 396 F.2d 264 (2d Cir. 1968), revg. a Memorandum Opinion of this Court, the existence of a "business purpose" deprives the Commissioner of his authority to reallocate income and deductions under section 482. Petitioners maintain that the "desire to avoid a contribution by the corporation that would have far exceeded the amount that the corporation could expect to utilize as a tax deduction" represents a "business purpose." While we are fully aware that many business decisions are animated, either in whole or in part, by tax considerations, it is clear that the desire to maximize the benefit of a deduction is not the sort of non-tax motive that the term "business purpose" denotes in this

context. *Aiken Drive-In Theatre Corp. v. United States*, 281 F.2d 7, 10 (4th Cir. 1960).

The petitioners' third argument is that section 482 does not apply because the transaction meets the "arm's length" test set forth in the regulations. Sec. 1.482–1(b)(1), Income Tax Regs. Petitioners contend that the restructuring of the partners' interests in the property by means of the disproportionate distribution was in effect an exchange that was economically beneficial to both partners and therefore would have been adopted by unrelated and uncontrolled entities. In support of their contention, petitioners point to the facts that the reduction of the corporation's interest in tract I (the portion donated to the city) had no detrimental effect upon the corporation, because the corporation could not have fully utilized the deduction for a charitable contribution of a 51-percent interest in the property, and that the corresponding increase in the corporation's interest in tract II (the portion sold to the city) resulted in the corporation's receiving a greater share of after-tax dollars. We disagree with this argument.

The petitioners' argument that a hypothetical, unrelated and uncontrolled 51-percent partner would have acquiesced in the disproportionate distribution assumes that the hypothetical partner would have made a charitable contribution to the city of its interest in the property.[7] The validity of petitioners' assumption is doubtful, to say the least, where the hypothetical, unrelated and uncontrolled entity would have derived a greater economic or after-tax benefit by an outright sale of its 51-percent interest in the property rather than by participating in the contribution/sale.

*Northwestern National Bank of Minneapolis v. Commissioner*, an unreported case (D. Minn. 1976, 37 AFTR 2d 76–1400, 76–1 USTC par. 9408), affd. 556 F.2d 889 (8th Cir. 1977), presented a situation analogous to the present one. In that case, a bank owned all the stock of a bank building company which in turn owned 10-percent of the stock of Center, Inc., a corporation owning a valuable building complex. The bank's directors were informed of a possible sale by Center, Inc., of its

---

[7] While we commend Roger's generosity, we note that the gift of the land to the city was conditioned upon its being used exclusively as a public park and that the official name to be given the park was to include Roger's family name, "Dolese."

building complex which had substantially appreciated in value. The possible sale would in turn considerably increase the value of Center, Inc., stock. The bank's comptroller outlined to the bank's president three alternatives to deal with the bank building company's investment in Center, Inc. These alternatives were (1) bank building company could sell its stock in Center, Inc., and pay the capital gains tax; (2) bank building company could donate its stock in Center, Inc., to a charitable foundation sponsored by the bank, and the foundation could then sell the stock; or (3) bank building company could distribute its stock in Center, Inc., as a dividend to bank followed by a contribution to and sale by the charitable foundation of the Center, Inc., stock. The third alternative provided the best tax consequences because a charitable contribution by the bank would result in a far greater tax saving than a similar contribution by the bank building company, and therefore was adopted.

Pursuant to section 482, the Commissioner disallowed the charitable contribution deduction claimed by the bank for its donation of the stock in Center, Inc., to the charitable foundation and allocated the deduction to the bank building company. As a result of the Commissioner's actions, the bank building company received a refund of approximately $11,000, plus interest; however, the disallowance of the charitable contribution deduction to the bank resulted in tax deficiencies of approximately $190,000, plus interest. The court sustained the Commissioner, reasoning that the tax consequences of the plan, which resulted in a tax loss to the bank building company and a tax gain to the bank, were clearly different from those that would ensue in the case of two uncontrolled taxpayers dealing at arm's length.

The petitioners' final argument is that, while section 482 authorizes the allocation of income, deductions, and credits, the Commissioner has no authority under the statute to allocate "assets." The petitioners claim that the respondent has improperly exercised his authority under section 482 because he has reallocated assets, i.e., the interests of Roger and the corporation in the property prior to the contribution/ sale to the city. The simple answer to this argument is that the Commissioner has allocated income (capital gain) and a

deduction (charitable contribution), and not assets, from Roger to the partnership.

To reflect the foregoing,

*Decision will be entered for the respondent.*

