PAUL SERDAR and HARRIET SERDAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Serdar v. Commissioner
Docket No. 28883-83.
United States Tax Court
T.C. Memo 1986-504; 1986 Tax Ct. Memo LEXIS 105; 52 T.C.M. (CCH) 750; T.C.M. (RIA) 86504; October 6, 1986. Steven *106 Brown and Harvey M. Silets, for the petitioners. Judy Jacobs, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for their taxable years 1973 and 1974 in the amounts of $316,677 and $21,999, respectively. After concessions, the issues are: (1) Whether the consideration petitioners received for contiguous properties referred to herein as the Serdar Property and Wadsworth Farm included a prepayment penalty, so as to preclude installment sales reporting under section 453; [1] (2) if the consideration received for the Serdar Property and Wadsworth Farm did not include a prepayment penalty, whether the sale of the Serdar Property qualifies for installment sale treatment, and whether the exchange of Wadsworth Farm qualifies for nonrecognition treatment under section 1031; and (3) whether petitioners may deduct an amount for a contribution to charity in excess of the amount allowed by respondent. *107 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Paul E. Serdar (hereinafter "petitioner") and Harriet E. Serdar (hereinafter "Harriet"), husband and wife, resided in Wadsworth, Illinois at the time of filing their timely petition in this Court. They filed joint Federal income tax returns for taxable years 1973 and 1974. Petitioner has lived in Lake County, Illinois, all his life. Before he retired in 1980 he was at various times a mink rancher, a manufacturer of animal health products, the manager of a private detective agency, and an investor in real estate. He was also active in Lake County politics as a member of the Northeastern Illinois Planning Commission. Petitioner was acquainted with Tempel Smith (hereinafter "Smith"), a local businessman. [2] Smith was Chairman of the Board of Tempel Steel Co., and owned a large amount of land in Lake County. Smith had amassed the land so that he could develop it. Smith confided in petitioner his plans to develop the land and sought petitioner's help in gaining support for his development projects. *108 On October 15, 1970, petitioners entered into an installment contract to sell approximately 290 acres (hereinafter "Locust Lawn Farm") to Smith for a purchase price of $2,400,000. Smith owned and planned to develop the land surrounding Locust Lawn Farm. Under the terms of the original contract Smith was obligated to pay $696,000 by October 1, 1971. The balance remaining of $1,704,000 was to be paid in forty quarterly installments of $42,600. Interest on the unpaid principal balance was payable quarterly. Title to Locust Lawn Farm was not to transfer to Smith until he had reduced the unpaid principal balance to $1,200,000 or less. The contract was amended on March 31, 1972, after Smith failed to meet its terms. The amendment revised the payment schedule provided in the original contract, and limited Smith's right to prepay the purchase price. The amendment specified that Smith had the right to prepay the difference between the amount of principal that he had paid and $1,200,000 on or after January 1, 1973, and that Smith had the right to prepay the entire $2,400,000 purchase price on or after January 1, 1974. If Smith prepaid any of the balance before he was permitted to, *109 the amendment provided that he was to "pay a premium [hereinafter "prepayment penalty"] equal to one-half of the actual federal income taxes which seller will be compelled to pay with respect to the year of prepayment, resulting from such prepayment." The amendment did not alter Smith's right to receive title to Locust Lawn Farm upon paying $1,200,000 of the principal. [3]
On or about January 7, 1973, petitioner and Smith agreed that it would be to their mutual advantage for Smith to prepay the entire purchase price of Locust Lawn Farm. Petitioner needed funds to prevent his mink farm from being foreclosed on, and Smith needed clear title to Locust Lawn Farm to refinance loans on his other landholdings. Petitioner orally agreed to waive the prepayment penalty in return for a complete prepayment. Later in January 1973, Smith *110 prepaid the balance of the purchase price and received title to Locust Lawn Farm. Petitioners also owned separately two other parcels of land (hereinafter referred to as the "Serdar Property" and "Wadsworth Farm"). The parcels adjoin each other and are separate from Locust Lawn Farm. The western edge of the Serdar Property runs north-south and forms the eastern edge of Wadsworth Farm. Together, the two properties form a 2.04 acre rectangle with dimensions of approximately 175.9 feet on the north and south, and 526 feet on the east and west, less a narrow rectangle on the northeast corner of the Serdar Property with dimensions of 17 feet on the north and south, and 200 feet on the east and west. The properties were bordered on the east by a railroad right of way containing a side track, on the south by Wadsworth Road, and on the north and west by property owned by Smith. [4] A 9,100 square foot one story commercial building containing open work areas was located on the southeast portion of the Serdar Property. Petitioner had purchased the Serdar Property around 1940 and had acquired Wadsworth Farm in the middle 1960's in exchange for property to the immediate north of the Serdar *111 Property and the rectangle cut out of the northeast corner of that property. Title to Wadsworth Farm was in Harriet's name. Title to the Serdar Property was in petitioner's name. Smith owned approximately thirty-five acres that bordered the Serdar Property and Wadsworth Farm on the north and west. Smith had acquired the property in 1970 and planned to construct a manufacturing plant on it. Smith's thirty-five acres had only limited access to the rail sidetrack that ran up alongside the eastern boundary of the Serdar Property, and to Wadsworth Road, which bordered the Serdar Property and Wadsworth Farm on the *112 south. Only a part of the sidetrack extended north past the northern edge of the Serdar Property onto Smith's property, and Smith's ability to extend the sidetract further north into his property was limited by a bog located immediately north of the end of the sidetrack. A road connecting Smith's property to Wadsworth Road ran alongside the western edge of Wadsworth Farm, but the road was inadequate to efficiently accommodate the traffic he expected his plant to generate. Smith's ability to improve the road by widening it to the west to accommodate the traffic was restricted by the Des Plaines River. The Des Plaines River ran to the west of Smith's property and its flood plain extended east into his property. By obtaining the Serdar Property and Wadsworth Farm, Smith would improve his property's access to the rail sidetrack and Wadsworth Road.Petitioner knew that Smith was convinced that obtaining the Serdar Property and Wadsworth Farm was essential to the success of his proposed plant. In late 1973, petitioner agreed to sell Smith the Serdar Property for $250,000. [5] Under the terms of the sales contract, the sales price was payable in forty quarterly installments of $6,250 *113 commencing March 31, 1974. Interest was payable annually on the balance at the First National Bank of Chicago's prime rate. Smith apparently believed at the time that the Serdar Property included Wadsworth Farm. When he discovered that the Serdar Property excluded Wadsworth Farm, he sought to obtain Wadsworth Farm. Petitioner originally refused to sell Wadsworth Farm.He was concerned about the taxes on the large amount of income that he was receiving in 1973. A few months after petitioner refused to sell Smith Wadsworth Farm, Smith offered to trade petitioner a property known as Engelhart Farm for Wadsworth Farm. Engelhart Farm consisted of about thirty-eight acres and a farmhouse built about 1810. It was located approximately two miles from Wadsworth Farm. Smith had purchased Engelhart Farm in May 1973 for $135,000. Petitioner agreed to trade Wadsworth Farm for Engelhart Farm with the intention, inter alia, of allowing his son's family to reside there. [6] Deeds transferring the Serdar Property and Wadsworth Farm to Smith were dated January 2, 1974 and *114 were recorded on June 27, 1974. Petitioners also owned the 2.3 acres immediately south of the Serdar Property and Wadsworth Farm (hereinafter the "Contributed Property"). The Contributed Property's eastern boundary abutted the railroad right of way that contained the sidetrack that ran north along the eastern edge of the Serdar Property into Smith's property. Only about sixty-five hundredths of an acre of the land was suitable for development, as the remainder was part of the flood plain of the Des Plaines River. Petitioner promised Smith first option to purchase the Contributed Property after Smith expressed a tentative interest in purchasing it. No sales date or price was agreed upon. The Contributed Property was located in the Lake County Forest Preserve District (hereinafter the "Forest Preserve"). The Forest Preserve was interested in acquiring the Contributed Property and retained an appraiser to value it. The appraiser, Herbert F. Harrison (hereinafter "Harrison") had extensive experience appraising Lake County real estate. He had served as the appraiser to local governments for twenty years, and had *115 been involved in at least eight hundred Lake County property sales. He had in addition performed approximately eleven hundred appraisals for the supervisor of assessments of Lake County. Harrison valued a rectangular parcel that included the Contributed Property, plus a little more, at $5,750 as of May 14, 1973. The Forest Preserve typically acquired property by first tendering offers and attempting to purchase the property. If it was unable to purchase the property, the Forest Preserve would file a petition to condemn it. The Forest Preserve contacted petitioner on or about October 16, 1973, to obtain the Contributed Property, and offered him approximately $5,000. Petitioner followed the advice of his attorney and donated the Contributed Property to the Forest Preserve rather than sell it for the amount offered. Petitioners claimed on their 1973 return a charitable deduction of $375,000 for the donation of the Contributed Property to the Forest Preserve. The locations of the Contributed Property, the Serdar Property, Wadsworth Farm, and Smith's property, are illustrated by the following diagram: [SEE ILLUSTRATION IN ORIGINAL] Respondent audited petitioners' 1973 and *116 1974 returns and determined that petitioners in 1973 received a penalty from Smith related to Smith's prepayment of the sales price of Locust Lawn Farm. Respondent determined that the penalty was paid to petitioners in the form of consideration for the Serdar Property and Wadsworth Farm that exceeded their adjusted bases and the cost of the sale of the Serdar Property. [7] Respondent determined that the prepayment penalty was $315,878. [8] Respondent did not determine that the sale of the Serdar Property failed to qualify for installment sale treatment, or that the exchange of Wadsworth Farm for Engelhart Farm failed to qualify as a section 1031 exchange. Respondent's determination increased petitioners' 1973 ordinary income by $315,878, and decreased petitioners' capital gain income for the years 1974 through 1981 by the amount of long-term capital gain that they had reported under the installment method on the sale of the Serdar Property. *117 By amended answer, respondent has alleged that the $315,878 of unreported ordinary income from the prepayment penalty, that he had included in petitioners' income for taxable year 1973 for purposes of his original determination, should properly be included in petitioners' income for taxable year 1974. Respondent based his determinations of the fair market value of the Serdar Property and Wadsworth Farm on an appraisal performed by his employee, H. Paul Smutney (hereinafter "Smutney"). Smutney determined that the building on the Serdar Property had a value of $37,000, and that the 2.04 acres of the Serdar Property and Wadsworth Farm had a value of $8,000. Respondent also determined that the Contributed Land donated to the Forest Preserve had a fair market value on the date of the donation of only $5,000, and accordingly disallowed $370,000 of petitioners' claimed $375,000 deduction. Respondent based his determination of the fair market value of the Contributed Land on an appraisal performed for him by Smutney and the appraisal performed for the Forest Preserve by Harrison. [9]
*118 OPINION Prepayment Penalty
We note at the outset that respondent's determinations are presumptively correct, and that the burden of proving that they are incorrect rests on petitioners. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). After reviewing the evidence before us, we find that petitioners have proven that the consideration they received for the Serdar Property and Wadsworth Farm did not include a prepayment penalty from their sale of Locust Lawn Farm. At trial, petitioner testified at length concerning the circumstances surrounding the sale of Locust Lawn Farm and the Serdar Property, and the exchange of Wadsworth Farm. His testimony was credible, and we believe it is trustworthy. It is undisputed that petitioners received consideration worth $385,000. At issue is whether that consideration included a prepayment penalty with respect to the Locust Lawn Farm sale, in addition to the consideration for the Serder Property and Wadsworth Farm. Petitioner testified at trial that the consideration received for the Serdar Property and Wadsworth Farm did not include a prepayment penalty. Respondent presented no direct evidence that it *119 did. Respondent's determination that the consideration included a prepayment penalty was based on an appraisal that indicated that the fair market value of the Serdar Property and Wadsworth Farm totaled substantially less than the value of the consideration. The fair market value of property is a question of fact, to be resolved by considering and weighing all relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). It must be measured in terms of cash price realizable. See, e.g., Willow Terrace Development Co. v. Commissioner,345 F.2d 933, 936 (5th Cir. 1965), affg. 40 T.C. 689 (1963), cert. denied 382 U.S. 938 (1965); Kaplan v. United States,279 F. Supp. 709, 711 (D. Ariz. 1967). Any special use to which a property may be put due to its adapability to a particular business is an element that must be considered in determining its fair market value. Mitchell v. United States,267 U.S. 341, 344-345 (1925); Stanley Works v. Commissioner, 87 T.C.     (Aug. 12, 1986).We think that respondent's appraisal failed to adequately take into account factors that *120 made the properties peculiarly adaptable to Smith's use, and that their fair market value equaled the value of the consideration received for them. The factors that the appraisal failed to adequately take into account are the value to Smith of the road and railroad access that the properties provided and their assemblage value, and, with respect to the Wadsworth Property, the value to Smith of eliminating a tract of land that would have jutted north into his assemblage. The Serdar Property and Wadsworth Farm provided Smith with valuable access to the Milwaukee Road Railroad Line and Wadsworth Road. The Serdar Property was uniquely situated, as the sidetrack was the only one in the area that provided access to the Milwaukee Road Railroad Line. Without the Serdar Property, Smith's access to the sidetrack was limited to the short stretch that extended north past the northest corner of the Serdar Property into his property. [10] Smith was unable to extend the sidetrack further north into his property due to a bog located immediately north of the end of the sidetrack. By purchasing the Serdar Property, Smith also ensured that the sidetrack's southern portion would not be put to a use *121 that would cause it to become congested and restrict the access of rail cars to his proposed plant. Wadsworth Farm similarly provided Smith with improved access to transportation. His property was bounded by the right of way of the Milwaukee Road Railroad Line on the east, and the Des Plaines River on the west. Its only outlet to a road was a narrow strip of frontage to the south on Wadsworth Road between Wadsworth Farm on the east, and the flood plain of the Des Plaines River on the west. Although a road that connected Smith's property to Wadsworth Road ran along the western edge of Wadsworth Farm *122 to the east of the flood plain, the road was inadequate for the traffic Smith planned for it to carry. Acquiring Wadsworth Farm allowed Smith to widen the road to accommodate the traffic he expected it to carry without widening it into the flood plain to the west.Acquiring Wadsworth Farm additionally eliminated a troublesome piece of land that would have seriously restricted Smith's ability to utilize the southern part of his property by separating the eastern portion from the western portion. By owing the Serdar Property and Wadsworth Farm Smith increased the value and usefulness of his land that bordered them, by improving its access to transportation, as well as by increasing the total area. The properties were therefore worth more to Smith than they would have been to a purchaser who did not own adjoining land that he wanted to put to use in a way that would fully utilize the rail line and road that they provided access to. In short, to Smith, an adjoining landowner with plans for industrial development, the Serdar Property and Wadsworth Farm had assemblage value: the whole was worth more than the sum of the parts. There is no indication that respondent's appraisal took *123 into account the value of the road and railroad access that the properties provided Smith for his other properties. [11] There is similarly no evidence that the sales the appraiser identified as comparable sales and used to determine the value of the Serdar Property and Wadsworth Farm were properties purchased to provide access to transportation facilities comparable to those afforded by the Serdar Property and Wadsworth Farm. We therefore find that their sales prices were not indicative of the value of the properties to Smith. In sum, we believe that Smith was convinced that it was essential to acquire the Serdar Property and Wadsworth Farm to enable him to develop his property as he planned, that he was therefore willing to pay a high price for those properties, and that petitioner knew of Smith's plans and drove a hard bargain. We find here no element of any prepayment penalty with respect to the Locust Lawn Farm sale. Tax Accounting for the Serdar Property and Wadsworth Farm
As we hold *124 that the consideration received for the properties did not include a prepayment penalty, we must address the issues of whether: (a) Petitioners are entitled to account for the sale of the Serdar Property as an installment sale; and (b) whether the exchange of Wadsworth Farm for Engelhart Farm qualifies as a section 1031 exchange, all as claimed by petitioners. (a) The sale of the Serdar Property qualifies for installment sale treatment if, as provided by section 453 in the years in issue, "in the taxable year of the sale * * * the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price." Respondent argues that the sale of the Serdar Property and the exchange of Wadsworth Farm were in substance one transaction, in which at least 35 percent (the $135,000 value of Engelhart Farm/the $385,000 sales price) of the selling price was received in the taxable year of the sale, thus disqualifying the transaction from installment sale treatment. Although it is settled law that a taxpayer may not bifurcate what is in reality a single transaction into two separate transactions simply to save taxes, Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938), *125 it is equally well settled that the Commissioner may not merge truly separate transactions simply to increase taxes. See Dolese v. Commissioner,82 T.C. 830, 836-838 (1984). As respondent first raised the issue that the sale of the Serdar Property fails to qualify for installment sale treatment in his answer, he bears the burden of proof on it. Rule 142(a). The facts of this case indicate that the sale of the Serdar Property was a separate transaction from the exchange of Wadsworth Farm. First, this is not a case where an historically unitary property was split for tax purposes. The two properties had historically been separate. Wadsworth Farm and the Serdar Property were acquired by petitioners at different times, and title to the two properties was in separate names.Second, the two transactions were negotiated at separate times. The exchange of Wadsworth Farm was not negotiated until after petitioners had agreed to sell the Serdar Property.Third, there were separate contracts for each of the transactions. Although the contracts were executed on the same day, that is not enough, by itself, to convince us that the transactions must be merged. Where, as here, *126 sales are negotiated at separate times, of historically separate properties, titled in different names, we will not merge the transactions absent evidence, not present in this case, that the transactions were separated purely for tax purposes. As the evidence did not indicate that more than thirty percent of the $250,000 sales price of the Serdar Property was received in the taxable year of the sale, we hold that the sale of the Serdar Property qualifies for installment sale treatment under section 453. [12]
(b) In his brief filed after trial, respondent for the first time argues that petitioners' exchange of Wadsworth Farm for Engelhart Farm fails to qualify as a section 1031 exchange, as it was treated by petitioners. To qualify for treatment under section 1031, three requirements must be satisfied: (1) The transaction must be an exchange; (2) the exchange must involve like-kind properties; and (3) both the properties *127 transferred and the properties received must be held either for productive use in a trade or business or for investment. Sec. 1.1031(a)-1(a) and (c), Income Tax Regs.; Click v. Commissioner,78 T.C. 225, 230 (1982). Respondent does not question that the transaction at issue constitutes an exchange. Respondent furthermore does not contest that Wadsworth Farm and Engelhart Farm are like-kind properties as the nature and character of the properties, as distinguished from their grade or quality, are substantially the same. See generally sec. 1.1031(a)-1(b), Income Tax Regs.; Koch v. Commissioner,71 T.C. 54, 65 (1978). The question that respondent raises is whether Engelhart Farm, like Wadsworth Farm, was held by petitioners for investment or productive use in a trade or business. This Court has held on numerous occasions that it will not consider issues that have not been pleaded. See, e.g., Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973). Whether an issue has been properly raised *128 depends on whether the opposing party has been given fair notice of the matter in controversy. Rule 31(a). We must determine whether petitioneres were prejudiced and disadvantaged when respondent raised the issue of whether the exchange of Wadsworth Farm for Engelhart Farm qualifies as a section 1031 exchange. The issue of whether the exchange of Wadsworth Farm for Engelhart Farm qualifies as a section 1031 exchange was not raised by respondent until after trial, and then only on brief, and with no attempt to amend his answer herein to raise such new issue. The determination of whether the exchange qualifies depends on whether petitioners intended to hold Engelhart Farm for investment purposes. [13] At trial, petitioners were unaware of the need to present any evidence on whether they intended to hold Engelhart Farm for investment purposes, as it was irrelevant to the contested issues. This was a new issue, not properly pleaded, and we will not consider it. Rule 41(b); Rule 34(b)(4); Markwardt v. Commssioner,supra; Estate of Mandels v. Commissioner,supra;Estate of Horvath v. Commissioner,supra.
*129 Contribution Deduction
The final issue for our decision is whether petitioners are entitled to deduct an amount in excess of the $5,000 allowed by respondent for their donation of the Contributed Property to the Forest Preserve. Section 170 allows an individual a deduction for charitable contributions, subject to percentage limitations and with a carryover of any contributions in excess of those limitations. See sections 170(b) and (d). If the charitable gift is of property other than money, the amount of the contribution is the fair market value of the property as of the date contributed, reduced when necessary as provided in section 170(e)(1). Sec. 1.170A-1(c)(1), Income Tax Regs. The generally accepted definition of fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property as of any given date is a question of fact, to be resolved by considering and weighing all relevant evidence in the *130 record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Respondent's determination in the notice of deficiency of the fair market value of the contributed property is presumptively correct, and the burden of proving a higher fair market value rests on petitioners. Welch v. Helvering,supra; Rule 142(a). At trial, respondent offered the testimony of two appraisers, IRS employee Smutney and independent appraiser Harrison, to support his determination that the fair market value of the Contributed Property was $5,000. The appraisers were both well qualified, and both had extensive experience in appraising Lake County real estate. Smutney appraised the Contributed Property at $5,000 as of October 1, 1973.Harrison had valued a parcel that included the Contributed Property, plus a little more, at $5,750 as of May 14, 1973.After hearing the appraisers' testimony, and reviewing their appraisals, we find that their appraisals accurately reflect the value of the Contributed Property and support respondent's determination of its value. Petitioner presented testimony at trial that he had promised Smith first option to purchase the Contributed Property *131 after Smith expressed a tentative desire to obtain it. No firm agreement to sell had been reached, and no price had been agreed upon. We hold that this activity did not establish the fair market value of the Contributed Property. Two appraisals had been made of the Contributed Property on behalf of petitioners. Each valued the property at $375,000. We find those appraisals to be significantly less persuasive than the appraisals obtained by respondent. Both appraisals relied largely upon the premise that the Contributed Property was comparable to the Serdar Property. [14] We have found that the Serdar Property was uniquely valuable to Smith. [15] It provided his property to the north and west with access to the railroad sidetrack and Wadsworth Road and he was willing to pay a high price to gain that access.The Contributed Property was not necessary to Smith to provide his property with access to transportation, and was therefore not comparable to the Serdar Property. Furthermore, as we have found, only about two-thirds of an acre of the Contributed Property could be developed, as the remainder of the tract lay in a flood plain. *132 Fair market value must be measured in terms of the cash price realizable. See, e.g., Willow Terrace Development Co. v. Commissioner,345 F.2d 933, 936 (5th Cir. 1965), affg. 40 T.C. 689 (1963), cert. denied 382 U.S. 938 (1965); Kaplan v. United States,279 F. Supp. 709, 711 (D. Ariz. 1967).We hold that petitioners have not met their burden of proof and demonstrated that the cash price realizable for the property exceeded the $5,000 determined by respondent. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Smith is now deceased.↩
3. The contract's payment schedule was amended again by letter dated September 9, 1972, after Smith failed to meet the terms of the amended contract. This amendment did not alter the provisions restricting Smith's right to prepay the contract and governing his right to receive title to Locust Lawn Farm upon reducing the principal balance to $1,200,000.↩
4. The sidetrack connects to a switching line that enables trains to enter and exit the fast track of the Milwaukee Road Railroad Line. Access to the switching line allows shippers to dispatch freight north to Milwaukee, or south to Chicago. Switching lines are expensive to build, and the cost of the line was originally justified by the large volume of milk that was once shipped from Wadsworth. There are few switching lines along the Milwaukee Road Railroad Line. Wadsworth Road is a well known road, as it is located exactly halfway between Chicago and Milwaukee.↩
5. The original agreement was oral. The written contract between petitioners and Smith was dated October 19, 1973.↩
6. His son's family eventually did move onto Engelhart Farm.↩
7. Respondent determined that the fair market values of Engelhart Farm and the note received for the Serdar Property were $135,000 and $250,000, respectively. Respondent determined that the cost of sale of the Serdar Property, and the adjusted bases of Wadsworth Farm and the Serdar Property, were $4,135, $1,801, and $63,186, respectively. ↩
8. That amount was the sum of the excess of the $135,000 fair market value of Engelhart Farm over the $1,801 adjusted basis of Wadsworth Farm, and the excess of the $250,000 note received for the Serdar Property over the $63,186 adjusted basis of that property and the $4,135 expenses of its sale. Respondent states on brief that the proper measure of the prepayment penalty is the full $340,000 difference between what he determined to be the fair market value of the properties transferred ($385,000 fair market value of Engelhart Farm and note, less $45,000 fair market value of the Serdar Property and Wadsworth Farm), and that petitioners suffered a $24,122 capital loss on the transfer ($69,122 basis and cost of sale, less $45,000 amount realized). Respondent declined to amend his answer, however, to assert the small amount of increased deficiency that would result from a technically correct computation.↩
9. Smutney determined that the property had a fair market value of $5,000 as of Octoter 1, 1973.↩
10. We find the issue of whether the railroad sidetrack is actually located on the Serdar Property to be unimportant. The relevant consideration is that the Serdar Property controlled access to the sidetrack over much of its length. Even if the sidetrack was located in part on the narrow strip that Smith owned, extending 200 feet down the east side of the Serdar Property, it was no good to Smith, since the 17 foot width of the strip would be scarcely more than the width of the track and ballast, and would give Smith no loading/unloading access to cars standing in that strip.↩
11. The failure to consider the value of the access to the railroad is perhaps explained by the appraiser's testimony that he is "not a real expert" on railroad tracks.↩
12. Under the terms of the sale, $6,250 was payable quarterly beginning the first quarter of 1974. Twenty-five thousand dollars was therefore due during 1974, the year of the sale. There was no evidence that more than the $25,000 due was paid during 1974.↩
13. The fact that petitioners intended to allow their son and his family to reside at Engelhart Farm does not, as respondent suggests, settle the issue of whether petitioners intended to hold Engelhart Farm for investment purposes.A taxpayer's intent to hold property for investment must be determined as of the time of the exchange. Click v. Commissioner,78 T.C. 225, 231 (1982). For purposes of sec. 1031, property is held for investment purposes if losses from the sale or exchange of such property are deductible. Starker v. United States,602 F.2d 1341, 1350-1351 (9th Cir. 1979). When property is purchased both to provide a residence for relatives, and for investment purposes, a loss from the sale or exchange of the property is deductible if it is held primarily for investment purposes. Jefferson v. Commissioner,50 T.C. 963, 968 (1968). Whether property is held primarily for investment purposes is a question of fact. Jefferson v. Commissioner,supra.↩
14. One appraisal noted that land values in the area normally did not exceed a maximum of $20,000 per acre and that the only sale in the area that was anywhere near the over $163,000 per acre value at which he appraised the Contributed Property was the sale of the Serdar Property. The other appraisal listed only four comparable sales, only one of which, the Serdar Property, sold for more than $10,000 per acre. ↩
15. As we found in Palmer v. Commissioner,23 B.T.A. 296↩ (1931), the sales price of property that is uniquely valuable to a taxpayer is not representative of the fair market value of nearby property.